[No. 956-2.   Division Two.   April 27, 1973.]

JOHN C. MERKEL et al., *Petitioners,* v. PORT OF BROWNSVILLE et al., *Respondents.*

*John C. Merkel, Prosecuting Attorney, W. Daniel Phillips, Deputy, Slade Gorton, Attorney General, Charles B. Roe, Jr., Senior Assistant,* and *Robert Jensen, Assistant,* for petitioners.

*William R. Garland,* for respondent.

PETRIE, J.—This is an action instituted by petitioners to enjoin respondent, Port of Brownsville, from proceeding with certain actions preliminary to the redevelopment of a small boat marina along Burke Bay. The Attorney General of the State of Washington and the Prosecuting Attorney of Kitsap County seek review of the trial court's refusal to grant a preliminary injunction prohibiting the port from cutting timber and clearing and grading the uplands portion of the project.

This case raises important issues under the State Environmental Policy Act of 1971 (SEPA) (RCW 43.21C), and the Shoreline Management Act of 1971 (SMA) (RCW 90.58). All parties agree that the provisions of these acts govern the disposition of this controversy, but do not agree to what degree they affect the present litigation.

The proposed project consists of constructing protected moorage facilities for recreational boats at Brownsville on Puget Sound. Brownsville is an unincorporated town on Burke Bay on the east side of the Kitsap Peninsula. In 1965

the Port of Brownsville contacted the Army Corps of Engineers and requested a survey report on the proposed marina expansion. After the survey was completed a detailed project report was prepared by the corps and finally approved in 1971. The comprehensive plan, with subsequent amendments, provides for the construction of a permanent breakwater, piers and floats which will more than double the present capacity, and for the installation of facilities for the sale and repair of boats, parking areas and other commercial services related to the project. The improvements encompass 12½ acres along Burke Bay and 10 acres of adjacent uplands at the mouth of the bay. At present this acreage is almost entirely undeveloped and remains heavily forested with Douglas fir trees.

Actual construction under the plan began with the cutting and clearing of timber in the upland portion of the property in September, 1972. After some 50 trees had been felled, petitioners commenced this action to enjoin any further activity by the port until it had obtained substantial development permits as required by the SMA. Petitioners further alleged that the provisions of SEPA required that an environmental impact statement be filed because the project contemplated by the port was a "major action having a substantial impact upon the environment."

On September 29, 1972, an ex parte restraining order was obtained by petitioners which temporarily restrained the port from proceeding further with excavation or construction on any portion of the project. Hearing on the order was held on October 6, 1972. The order was continued because the trial court found the impact statement filed by the port was deficient in that the port had failed to consult with and obtain comments from local, state and federal agencies having jurisdiction over any portion of the proposed project. The court also found that the uplands development constituted a major action significantly affecting the quality of the environment.

The port subsequently filed a revised statement. A hear-

ing was held to determine its adequacy. The trial court again found that insufficient time had been given interested agencies to submit their comments to the port, and continued the restraining order in effect. On December 21, 1972, the port submitted the third version of its environmental impact statement. No challenge was made to the adequacy of that revised statement. The trial court modified the existing restraining order by limiting its application to the 200 feet "wetlands" only, and by removing the upland portion of the project from further restraint. Thereupon, petitioners instituted this action for a writ of review and stay of proceedings. Pursuant to CAROA 57 (f) (4) (i) we granted the writ of certiorari and temporarily stayed the order of the trial court to the extent that it had dissolved the restraint in the area more than 200 feet inland from the level of ordinary high water.

Broadly stated, the central issue in this case is whether or not the development contemplated by the port, which is admittedly governed by the provisions of SEPA and SMA, is so interrelated and interdependent that no part of the project can proceed until all provisions of these acts have been fully complied with. Resolution of the issue necessitates an examination of these acts in some detail, as well as their application to the facts of the instant case.

The declared purpose of SEPA is to encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment; to stimulate the health and welfare of man; and to enrich the understanding of the ecological systems and natural resources important to the state and nation. RCW 43.21C.010. To achieve these goals, the act requires all state and local agencies, in performing their respective functions, to be cognizant of and responsive to possible environmental consequences in their actions. The act makes it the continuing responsibility of these agencies "to use all practicable means and measures," to carry out the policy of restoring and maintaining a quality environment. *See* RCW 43.21C.020. To assure that the sub-

stantive provisions of the act receive the attention they deserve, RCW 43.21C.030 prescribes certain procedural measures calculated to effectuate this policy. All branches of government in this state are required to:

> (a) Utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decision making which may have an impact on man's environment;
> (b) Identify and develop methods and procedures, in consultation with the department of ecology and the ecological commission, which will insure that presently unquantified environmental amenities and values will be given appropriate consideration in decision making along with economic and technical considerations;

RCW 43.21C.030(2)(a), (b).

SEPA further requires these agencies to include an environmental impact statement within any proposal for a major activity which significantly affects the environment. The detailed statement must contain the environmental impact of the proposed action, any adverse effects by reason of such action, and any alternatives to the proposed action. RCW 43.21C.030(2)(c).

It is clear that the provisions of SEPA are innovative and place new and unusual responsibilities on governmental agencies. Environmental protection has become a mandate to every agency entrusted with its care. *Stempel v. Department of Water Resources*, 82 Wn.2d 109, 508 P.2d 166 (1973). The statutory scheme contemplates that the goals of SEPA are realized by requiring these agencies to assess environmental consequences in formulating policies, and by compelling these agencies to follow SEPA procedures prior to initiating major activity. The court's function, minimally, is to insure that these procedures are followed. *Greene County Planning Bd. v. Federal Power Comm'n*, 455 F.2d 412 (2d Cir. 1972); *Calvert Cliffs' Coordinating Comm., Inc. v. United States Atomic Energy Comm'n*, 449 F.2d 1109 (D.C. Cir. 1971).

The Shoreline Management Act of 1971 (SMA) (RCW

90.58), though dealing with a limited area of the environment, is as vigorous as SEPA in declaring a policy aimed at the preservation of our natural resources. "Shorelines", as that term applies to this case, includes those "wetlands" extending landward for 200 feet in all directions as measured on a horizontal plane from the ordinary high-water mark. RCW 90.58.030(2)(f).

This act is an acknowledgement that "the shorelines of the state are among the most valuable and fragile of its natural resources"; that unrestricted construction upon them is not in the best public interest; and, therefore, there is a need for coordinated planning to prevent the inherent harm occasioned by piecemeal development of the shorelines. RCW 90.58.020.

■ To assure the intelligent development of our shorelines the act establishes a permit system, with primary responsibility for its administration upon local government, for the control of such development. RCW 90.58.050 and RCW 90.58.140(2). The Department of Ecology and local governments are required to prepare and adopt master programs to aid in the coordination and systematic development of the shorelines and lands adjacent to them. RCW 90.58.340. RCW 90.58.100(2) provides that master programs shall include:

(a) An economic development element for the location and design of industries, transportation facilities, port facilities, tourist facilities, commerce and other developments that are particularly dependent on their location on or use of the shorelines of the state;

. . .

(e) A use element which considers the proposed general distribution and general location and extent of the use on shorelines *and adjacent land areas* for housing, business, industry, transportation, agriculture, natural resources, recreation, education, public buildings and grounds, and other categories of public and private uses of the land;

(Italics ours.)

At the very least, the legislative scheme of SMA contem-

plates a systematic and intelligent management of our shorelines. Emphasis is placed upon a cooperative and unified effort by all governmental agencies to achieve a use policy consistent with the provisions of the act. It is also clear that lands adjacent to shorelines must also be taken into consideration if the consistency stressed in the act is to be achieved.

Initially, we note that the Port of Brownsville has not to date obtained all of the permits required by the SMA. In fact, three permits must be acquired by the port in order to carry out the project as proposed.[1]

With the foregoing discussion of the various provisions of SEPA and SMA as a backdrop, we now turn our attention to the case at bench. It is the position of the Port of Brownsville that SEPA governs the entire project and that, once having complied with its provisions, the port may proceed to cut the trees and clear the uplands without regard to whether or not the permits required by SMA have been issued. The port argues that because no objections have been raised to the revised environmental impact statement, there is nothing further for it to do. It is also the port's contention that references in SMA to lands adjacent to the shoreline constitute nothing more than an admonition to local government to adhere to the policies of the act in drafting guidelines for shorelines within their jurisdiction. Thus, the port concludes, no obstacles preclude clearing the uplands.

To accept the port's argument would require us to close our eyes to the obvious interrelation of this project upon the wetlands and adjacent uplands areas. There is nothing in the record before us to indicate that the contemplated construction has ever been anything but one project. The question, therefore, is whether the port may take a

---

[1]One of the permits is the conditional use permit, request for which is presently pending before the Board of Adjustment of Kitsap County.

The remaining two permits, the substantial development permits required by the SMA, are presently pending before the Kitsap County Board of Commissioners.

single project and divide it into segments for purposes of SEPA and SMA approval. The frustrating effect of such piecemeal administrative approvals upon the vitality of these acts compels us to answer in the negative. A brief look at the record lends credence to the soundness of this decision.

The supplemental environmental impact statement details at great length the impact this proposed project will have on the area. Among the changes are: the placement of boat buildings and other boat facilities on both the wetlands and uplands; the use of the uplands for dry storage; construction of parking facilities on the uplands to serve users of the marina; and use of the trees severed on the uplands portion in constructing floats for the marina expansion. Additionally, the present plan calls for the elimination of a large intertidal pool which lies on both the wetlands and uplands portions of the project.

. The coercive effect the construction of one segment would have upon the other is obvious. If clearing and construction activity is allowed to continue in the uplands portion before the wetlands portion has been approved, it is obvious the entire area will be affected. The legislature, in extending the scope of SMA to consideration of the use of lands adjacent to shorelines, sought to prevent this type of coerced land use development.

To permit the piecemeal development urged upon us by the port would lower the environmental mandates of these acts to the status of mere admonitions. The result would be frustration rather than fulfillment of the legislative intent inherent in these acts. This project will have a significant effect upon the environment. It is to the public's benefit that any project significantly affecting the environment and shorelines of this state comply with the procedures established by SEPA and SMA to insure that the environmental aspects have been fully considered. Irreparable damage would flow from allowing any portion of this project to proceed without full compliance with the permit requirements of the SMA. We can appreciate the added expense

the port must incur as a result of our holding but these inconveniences are far outweighed by the public's interest in attaining and maintaining an environment consistent with legislatively promulgated goals. It was, therefore, error to dissolve restraint in the area more than 200 feet inland from the level of ordinary high water. The injunction on the uplands as well as the wetlands should continue until all legal impediments imposed by the SMA have been removed.

Finally, petitioners argue that the port cannot legally sever any trees on this project until the comprehensive port plan is properly amended. They correctly state that the Brownsville Small Boat Basin Plan is an integrated project for which a comprehensive plan is required pursuant to the basic port district act as amended, RCW 53.20.010. This statute prohibits any improvements by a port district prior to official adoption of the plan by the port commission. The commission can only adopt the plan after a public hearing has been conducted following proper notice.

The record before us indicates that the port does have an officially adopted comprehensive plan, revised in September, 1972. This plan, however, does not reflect the changes in the project which have taken place since that time. The alterations from the officially adopted plan include the deletion and relocation of several buildings in the uplands area.

RCW 53.20.020 states:

> When such general plans shall have been adopted or approved, as aforesaid, *every improvement to be made by said commission shall be made substantially in accordance therewith unless and until such general plans shall have been officially changed by the port commission after a public hearing thereon,* of which at least ten days' notice shall be published in a newspaper in general circulation in such port district.

(Italics ours.) The clear intent of the legislature in enacting this law was to require a port commission, prior to entering into any improvement scheme, to place before the

people an actual plan disclosing with reasonable definiteness the character of the improvements. *Hughbanks v. Port of Seattle,* 193 Wash. 498, 76 P.2d 603 (1938). Any amendment altering an officially adopted plan must also be preceded by a public hearing.

Because the port has not complied with RCW 53.20.020 in amending its comprehensive plan, it has no authority to make any improvements under the plan until the changes are officially adopted after public hearing in the manner prescribed by statute.

The writ is granted and the Superior Court for Kitsap County is directed to reinstate the restraints previously imposed upon the cutting of timber and the clearing and grading of the upland portions of this project.

PEARSON, C.J., and ARMSTRONG, J., concur.