[No. 1955-1. Division One—Panel 1. June 4, 1973.]

JUANITA BAY VALLEY COMMUNITY ASSOCIATION *et al.,* *Appellants,* v. THE CITY OF KIRKLAND *et al., Respondents,* JOHN A. BIGGS, *Appellant.*

*Schroeter, Jackson, Goldmark, Bender, Anderson, Whelan, Brotman & Leed, P.S.,* and *Roger M. Leed,* for appellants.

*Powell, Livengood, Dunlap & Silvernale, Robert P. Tjossem, Ostrander, Van Eaton, Thomas & Ferrell,* and *Ralph I. Thomas,* for respondents.

*Slade Gorton, Attorney General, Charles B. Roe* and *Charles W. Lean, Assistants,* amici curiae.

SWANSON, C.J.—Does the State Environmental Policy Act of 1971 (SEPA) (RCW 43.21C) require branches of state government, specifically municipalities, to exercise legislative discretion with reference to the issuance of land use permits otherwise available as a matter of right in order to assist in the implementation of the state's environmental policy? We hold that it does.

This is an appeal by a group of property owners, as individuals and as an organization called the Juanita Bay Valley Community Association (Association),[1] from the trial court's denial of their application for a writ of mandamus and ancillary relief to halt grading, excavating and filling activity commenced by Kirkland Sand & Gravel, Inc. (KSG), pursuant to a grading permit issued by the City of Kirkland (City). The Association's claim for relief is based primarily upon its allegations that the City violated SEPA and the Shoreline Management Act of 1971 (SMA) (RCW 90.58) in issuing a grading permit to KSG.

The members of the Association own homes and property adjacent to a gravel pit operation which has been operated by KSG since 1936 on a portion of a 55-acre tract of land which includes a stream, generally referred to as Forbes Creek, and its adjoining marshlands, located about three-fourths of a mile east of Lake Washington. In early 1972, a plan to convert the gravel pit site into an industrial park was revealed. When KSG obtained a permit to excavate and grade its property, the local neighborhood residents attempted to persuade the Kirkland city council to withdraw the permit, but the council refused. Thereafter, the Association was formed, and it commenced suit to preserve what it describes as "a fragile marsh and wildlife habitat."

The Association's complaint sought a writ of mandamus directing the City to revoke KSG's grading and excavating permit and requiring the immediate cessation of all activities authorized by this permit. The complaint presented four major theories in support of the relief requested. First,

[1]The Association will be referred to herein as if it were the sole appellant.

the Association alleged that the City failed either to consider or obtain what has become commonly referred to as an Environmental Impact Statement, which is procedurally required by SEPA when a branch of the state government, such as the City, recommends or reports on proposals amounting to "major actions significantly affecting the quality of the environment." RCW 43.21C.030(c). Secondly, the Association asserted that the marshland area adjacent to Forbes Creek is an "associated wetland" within the meaning of SMA and therefore KSG must obtain a permit from the proper governmental agency before undertaking any excavating, grading or filling because such activity amounts to a "substantial development" on "shorelines" of the state. RCW 90.58.030(2)(f); RCW 90.58.140(2). Third, the Association claimed an applicable city ordinance was disregarded by the council when it approved the issuance of the grading permit. Finally, the Association contended that the grading permit was invalid because of an apparent conflict of interest on the part of one of the city council men who voted to approve the permit. The trial court made findings of fact and conclusions of law adverse to the Association's contentions, denied the requested relief, and dismissed the complaint. This appeal followed.

The appellant Association makes 65 separate assignments of error, 35 of which are directed to findings of fact, and 6 of which are assigned to the trial court's refusal to make certain requested findings. In addition, appellant assigns error to all of the court's conclusions of law except that relating to the court's jurisdiction. Error is also assigned to the dismissal of the complaint and to the trial court's order denying the appellant's motion for a new trial. Appellant argues its numerous claims of error in the context of the four principal theories outlined above, each of which is directed to the basic contention that the grading permit was unlawfully issued to KSG and ought to be revoked.

STATE ENVIRONMENTAL POLICY ACT OF 1971

Appellant's first major theory is that the grading permit was issued in violation of the policy and the procedural

mandate of SEPA inasmuch as no Environmental Impact Statement was prepared. The respondents KSG and the City essentially argue that (1) the strict procedural requirements of SEPA do not apply to the issuance of the grading permit, or (2) if they do, the facts as determined by the trial court make it clear an Environmental Impact Statement was not necessary in this case. The state Attorney General, appearing specially as amicus curiae, takes the position that it was incumbent upon the City, in making its decision not to prepare an Environmental Impact Statement, to *consider* environmental factors under procedures made applicable to all municipalities by the express language of SEPA such that a failure to do so necessitates a remand of the issue to the City.

 SEPA is the State of Washington's most fundamental expression of environmental policy. *See Stempel v. Department of Water Resources*, 82 Wn.2d 109, 508 P.2d 166 (1973). In the first paragraph of RCW 43.21C.020, the legislature expresses recognition of man's dependence upon the environment, the impact of his activity upon it, and the importance of restoring and maintaining environmental quality. The legislature then declares:

> that it is the continuing policy of the state of Washington . . . to use all practicable means and measures . . . in a manner calculated to: (a) Foster and promote the general welfare; (b) to create and maintain conditions under which man and nature can exist in productive harmony; and (c) fulfill the social, economic, and other requirements of present and future generations of Washington citizens.

The statute provides in subsection 2:

> In order to carry out the policy set forth in this chapter, it is the continuing responsibility of the state of Washington and all agencies of the state to use all practicable means, consistent with other essential considerations of state policy, to improve and coordinate plans, functions, programs, and resources to the end that the state and its citizens may:
> (a) Fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;

(b) Assure for all people of Washington safe, healthful, productive, and esthetically and culturally pleasing surroundings;

(c) Attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences;

(d) Preserve important historic, cultural, and natural aspects of our national heritage;

(e) Maintain, wherever possible, an environment which supports diversity and variety of individual choice;

(f) Achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities; and

(g) Enhance the quality of renewable resources and approach the maximum attainable recycling of depletable resources.

The legislative purpose of SEPA declared in RCW 43.21C.010 and the statement of policy set forth in RCW 43.21C.020 are implemented by RCW 43.21C.030 which states in pertinent part:

The legislature authorizes and directs that, to the fullest extent possible: (1) The policies, regulations, and laws of the state of Washington shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all branches of government of this state, including . . . municipal . . . corporations . . . shall:

. . .

(c) Include in every recommendation or report on proposals for legislation and other major actions significantly affecting the quality of the environment, a detailed statement by the responsible official on:

(i) the environmental impact of the proposed action;

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented;

(iii) alternatives to the proposed action;

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented;

Such procedural provisions of SEPA must not be overlooked. RCW 43.21C.030(1) makes it clear that all regulations and laws of the state must be read in light of the provisions of SEPA:

> The policies, regulations, and laws of the state of Washington shall be interpreted and administered in accordance with the policies set forth in this chapter, . . .

RCW 43.21C.060 restates this duty:

> The policies and goals set forth in this chapter are supplementary to those set forth in existing authorizations of all branches of government of this state, including state agencies, municipal and public corporations, and counties.

In short, the detailed procedural requirements of SEPA, specifically RCW 43.21C.030, are directly imposed upon all branches of state government, including municipalities.

In order to facilitate an understanding of our discussion concerning the requirements of SEPA in the context of the respective allegations and contentions of the parties, it is necessary to set forth the following chronological account of the pertinent facts and events as found by the trial court and confirmed by our review of the record to be supported by substantial evidence: KSG and two of its officers, G. L. Stubenrauch and Van A. Smith, own all of the property affected by the grading permit here in question. Gravel and other materials have been removed from portions of the subject property as long ago as 1904. In 1924, a gravel pit operation was established on a portion of the property, and in 1936 respondent KSG purchased the property and since has continued, at least to the time of trial, to conduct a gravel pit operation upon it. A certain unnamed stream, unofficially referred to as Forbes Creek, flows across a portion of the property from east to west and eventually into Lake Washington. When it crosses the KSG property, the stream is between 35 and 45 feet above the elevation of the surface of Lake Washington, and KSG's property is located three-fourths to one mile east of the high-water mark of Lake Washington.

In the summer of 1971, the City became aware of the fact that grading and excavation was being carried on by KSG upon its property south of Forbes Creek without the permit required by chapter 70 of the Uniform Building Code.[2] The City issued a stop work order, but subsequently granted a limited permit to include the grading and excavation work already done and to allow completion of certain landfill necessary to buttress adjoining property. SEPA became effective on August 9, 1971, and during the spring of 1972 preliminary advisory guidelines were prepared and circulated by the Department of Ecology.

Prior to March 31, 1972, between one-half and two-thirds of the entire subject property had been graded and excavated to the point that it was virtually free of any vegetation. On March 31, 1972, KSG applied for the grading permit challenged in this appeal. The application was made pursuant to chapter 70 of the Uniform Building Code and on May 24, 1972, KSG met all of the terms and conditions of that ordinance. At the time, there was no other relevant ordinance or regulation in effect.[3] On June 19, 1972, the city council unanimously approved the issuance of the grading

[2]In April of 1968 the City adopted by reference chapter 70 of the Uniform Building Code which regulates grading and excavation activities by a permit system. Before chapter 70 was adopted, the City had no regulation of any kind relating to grading and excavation. In 1970 the city council enacted ordinance No. 2128 which amended chapter 70 to include an alternative requirement that "[g]rading or excavation . . . be carried out with the approval of City Council." Kirkland Municipal Code § 21.08.070(4).

[3]On the same date as the grading application, March 31, 1972, KSG made a separate application to rezone portions of its property from "single family residential" to "light industrial," and elected to have this rezone application processed under the new zoning code, ordinance No. 2183, which subsequently had gone into effect. We note parenthetically that there is evidence in the record that an Environmental Impact Statement regarding the proposed rezone was in the process of preparation at the time of trial. Pursuant to KSG's request, the grading permit application was processed under chapter 70 of the Uniform Building Code as adopted by the City, but appellant argues that it was also subject to the provisions of ordinance No. 2183. This contention is discussed elsewhere in this opinion.

permit No. G-023, and on July 3, 1972, the permit was issued.[4]

The permit authorized KSG to excavate up to 100,000 cubic yards of material and to do certain other grading and excavating upon its property as specifically defined by plans filed with the City. With reference to the impact of SEPA upon the City's issuance of the grading permit, the trial court found:

> That an Environmental Impact Statement was not filed or prepared by the City of Kirkland with respect to the application for the Grading Permit in question prior to the time the same was issued on July 3, 1972.

Finding of fact No. 28. However, the court also found:

> That the evidence pertaining to the environmental and ecological impact of the filling and grading on subject property which is authorized by the Grading Permit G-023 is insufficient to establish that said activities will cause any significant impact on the environment or have any significant effect on the environment including the unnamed stream, Lake Washington and the shorelands thereof.

Finding of fact No. 32. In addition, the court found that any development of KSG's property under the existing land use ordinance of the City would have virtually the same impact or effect, both ecologically and economically, on the stream and adjoining properties as would the activities authorized by the grading permit.

Based upon these findings, the court concluded (1) the City was not required to prepare and file an Environmental Impact Statement prior to the issuance of the permit; (2) the issuance of the permit was not major action significantly affecting the quality of the environment; and (3) the City and its city council had no discretion whatsoever

---

[4]The city planning department had recommended that no action be taken on the grading permit application until after it had acted on the previously noted rezone application, and that the two applications be regarded as a single package. In its motion approving the grading permit, the city council included a statement to the effect that the City was not thereby committed one way or the other with reference to the rezone application.

to deny the issuance of the grading permit because KSG was entitled to have it issue as a matter of vested right.

The primary question presented is, Does the record reflect a violation of SEPA such that the grading permit in question must be deemed to be invalid? At the outset it is apparent that the very heart of the procedural requirements of SEPA is the necessity for preparation of an Environmental Impact Statement. RCW 43.21C.030(c). As appellant points out in its brief, an Environmental Impact Statement is particularly important because it documents the extent to which the particular agency has complied with other procedural and substantive provisions of SEPA; it reflects the administrative record; and it is the basis upon which the responsible agency and officials can make the balancing judgment mandated by SEPA between the benefits to be gained by the proposed "major action" and its impact upon the environment. At the same time, it should be noted that SEPA is patterned after the National Environmental Policy Act of 1969 (NEPA) (42 U.S.C. § 4321, et seq.) and contains language almost identical to that of the federal act.[5] It is well settled that when a state borrows

---

[5] In an amicus curiae brief, the state Attorney General discusses several differences between NEPA and SEPA, as follows: "SEPA is patterned very closely upon the National Environmental Policy Act of 1969 (NEPA), 42 USCA, Sec. 4321 et seq. In fact, much of the language is identical. There are, however, some significant differences between the two bills. The most important of these is found in RCW 43.21C.020(3), which reads as follows:

(3) The legislature recognizes that each person has a fundamental and inalienable right to a healthful environment and that each person has a responsibility to contribute to the preservation and enhancement of the environment.

"Identical language was included in the original version of NEPA passed by the Senate. The House version deleted the provision. The Act emerged from Conference with a similar provision, but without any reference to 'fundamental and inalienable' rights. The compromise resulted from 'doubt on the part of the House conferees with respect to the legal scope of the original Senate provision.' H.R. Rep. No. 91-765, 91st Cong. 1st Sess. 8 (1969). For a discussion of this change, and its possible implications, see Eva H. Hanks and John L. Hanks, *An Environmental Bill of Rights: The Citizen Suit and the National Environ-*

federal legislation it also borrows the construction placed upon such legislation by the federal courts. *See State v. Carroll,* 81 Wn.2d 95, 500 P.2d 115 (1972); *Friends of Mammoth v. Board of Supervisors,* 8 Cal. 3d 247, 502 P.2d 1049, 104 Cal. Rptr. 761 (1972).

Respondents KSG and the City argue that the appellant must bear the burden of proving the necessity for an Environmental Impact Statement by factually establishing that the issuance of the grading permit is a "major action" which significantly affects the quality of the environment. RCW 43.21C.030(c). They argue that the act of issuing a grading permit cannot constitute "major action" unless it is *legislative* action involving the exercise of *discretion.* They maintain that the action taken by the City in this case was *administrative* action only involving no discretion. In this connection, KSG points out that the test for making the distinction between the two types of action was set forth recently in *Durocher v. King County,* 80 Wn.2d 139, 152, 492 P.2d 547 (1972):

In distinguishing between legislative and administra-

*mental Policy Act of 1969,* 2 ENVIRONMENT L. REV. 147, 169-72 (1971) (Reprinted from 24 RUT. L. REV. 230 (1970)).

"A second noteworthy difference is that while NEPA applies only to the federal government and its various departments and agencies, SEPA applies to the state government plus all municipal and public corporations and counties. SEPA, as originally proposed, would only have included state agencies, but House amendments extended coverage to local governments. See *Senate Journal,* 1971 Ex. Sess., pp. 1808-09.

"A final difference between NEPA and SEPA is that there is no agency at the state level which exactly corresponds to the Federal Council on Environmental Quality. The Council issued guidelines on April 30, 1970, covering federal agency procedures under NEPA. At the state level, SEPA (RCW 43.21C.030(2)(b)) directs all branches of government to develop procedures to insure that environmental values will be given appropriate consideration in decision-making, 'in consultation with the department of ecology. . . .' The Department of Ecology attempted to facilitate this process by distributing its 'Preliminary Guidelines for Implementation of the State Environmenal Policy Act of 1971' . . . to all state and local governmental agencies. These guidelines were not adopted as regulations pursuant to the State Administrative Procedure Act (Ch. 34.04 RCW)."

tive actions of municipal legislative bodies, courts have frequently adopted two tests stated in 5 E. McQuillin, The Law of Municipal Corporations, § 16.55 (3d ed. 1969 rev. vol.) at page 213:

> . . . The power to be exercised is legislative in its nature if it prescribes a new policy or plan; whereas, it is administrative in its nature if it merely pursues a plan already adopted by the legislative body itself, or some power superior to it.

(Footnotes omitted.)

In essence, it is the contention of respondents KSG and the City that the SEPA requirement of an Environmental Impact Statement is applicable only in the case of a discretionary or policy making action during the course of which the municipality or governmental agency may consider and choose among various alternatives before taking any action. KSG directs us to *Getty Oil Co. v. Ruckelshaus,* 342 F. Supp. 1006 (D. Del. 1972), for the proposition that an Environmental Impact Statement is not required to be filed under NEPA with respect to administrative or nondiscretionary governmental actions. The City points out that this court has held that a city acts in an administrative capacity when it issues a special use permit under a city zoning ordinance. *Lund v. Tumwater,* 2 Wn. App. 750, 472 P.2d 550 (1970); *see also State ex rel. Morrison v. Seattle,* 6 Wn. App. 181, 492 P.2d 1078 (1971). Respondents declare that the issuance of building permits, even where that issuance may involve the exercise of some administrative or ministerial discretion, has been judicially determined to be a ministerial act. *See State ex rel. Klappsa v. Enumclaw,* 73 Wn.2d 451, 439 P.2d 246 (1968); *State ex rel. Kuphal v. Bremerton,* 59 Wn.2d 825, 371 P.2d 37 (1962); *Hull v. Hunt,* 53 Wn.2d 125, 331 P.2d 856 (1958); *State ex rel. Ogden v. Bellevue,* 45 Wn.2d 492, 275 P.2d 899 (1954).

Respondents' contention reformulated is simply that requiring the City to prepare an Environmental Impact Statement before issuing the grading permit would serve no useful purpose because the city council had no discre-

tion to deny the application for the grading permit once the requirements established by the building department had been met and therefore would amount to requiring the performance of a useless act, something that the law does not require.

The appellant denies that the City was obligated to issue a grading permit to KSG upon demand, thus making the preparation of an Environmental Impact Statement unnecessary. The appellant points out that the building code requires the city building official to make numerous judgments as to the type and extent of data to be prepared by the application and the conditions to be imposed upon grading and excavation activities. In addition, appellant argues that the grading plan itself lists 11 conditions, each of which represents an administrative judgment by the City pertaining to environmental factors. Appellant asserts that regardless of whether the City characterizes its action in issuing the grading permit as ministerial or discretionary, such characterization cannot defeat the express mandate of the legislature requiring the City to carry out the procedural steps of SEPA in addition to those set forth in the building code prior to the issuance of the grading permit.

We agree. Appellant directs our attention to federal courts which have held that the granting of a permit to a private party is an "action" subject to NEPA and which therefore have enjoined the issuance of such permits in instances where an Environmental Impact Statement was not prepared. *Citizens for Clean Air, Inc. v. Corps of Engineers*, 349 F. Supp. 696 (S.D.N.Y. 1972); *Kalur v. Resor*, 335 F. Supp. 1 (D.D.C. 1971). Similarly, the Attorney General, as amicus curiae, points to several federal decisions which make the provisions of NEPA applicable to the issuance of licenses, permits, or authorizations for private activities. *See Davis v. Morton*, 469 F.2d 593 (10th Cir. 1972); *Greene County Planning Bd. v. Federal Power Comm'n*, 455 F.2d 412 (2d Cir. 1972); *Calvert Cliffs' Coord. Comm. v. United States Atomic Energy Comm'n*, 449 F.2d 1109 (D.C. Cir. 1971). *See generally* 1 V. Yannacone, Jr., B. Cohen &

S. Davison, *Environmental Rights & Remedies* § 5:6 (1972).
██ In *Friends of Mammoth v. Board of Supervisors,
supra,* it was held that a California statute comparable to
NEPA, and therefore similar to SEPA, required a county
board of supervisors to consider whether a proposed condo-
minium construction "may have a significant effect on the
environment" and, if so, to prepare an Environmental Im-
pact Statement prior to making its decision to grant condi-
tional use and building permits. As the Attorney General as
amicus curiae argues, one of the purposes of NEPA and of
our state's counterpart statute, SEPA, is to avoid the ad-
verse impact upon the environment which takes place
when various phases of a project, or a series of projects, are
authorized by governmental agencies, in a piecemeal fash-
ion without regard to the cumulative impact of the total
development. *See Greene County Planning Bd. v. Federal
Power Comm'n, supra; Merkel v. Port of Brownsville,* 8
Wn. App. 844, 509 P.2d 390 (1973). In this connection, the
appellant asserts that the grading and excavating project
authorized by the permit at issue in the case at bar consti-
tutes the threshold act in the implementation of KSG's plan
for an industrial park development. This contention is sup-
ported by the trial court's finding of fact No. 16 which
states:

> That on March 31, 1972, Kirkland Sand & Gravel also
> made a separate application to rezone portions of the
> property zoned "Single Family Residential" to "Light In-
> dustrial," and Kirkland Sand & Gravel *would hope to
> use portions of land in F/F5 [the subject property] for an
> Industrial Park.*

(Italics ours.) Appellant correctly suggests that the envi-
ronmental impact of the total project, rather than that of
the grading project alone, must be weighed in order to
meet the requirements of SEPA. We therefore conclude
SEPA requires that an Environmental Impact Statement be
prepared prior to the first government authorization of any
part of a project or series of projects which, when consid-
ered cumulatively, constitute a major action "significantly

affecting the quality of the environment . . ." RCW 43.21C.030(c).

Moreover, we hold that RCW 43.21C.030(c) necessarily requires the *consideration* of environmental factors by the appropriate governing body in the course of all state and local government actions before it may be determined whether or not an Environmental Impact Statement must be prepared. Thus, SEPA requires that a decision *not* to prepare an Environmental Impact Statement must be based upon a determination that the proposed project is *not* a major action significantly affecting the quality of the environment. A decision by a branch of state government on whether or not to prepare an Environmental Impact Statement is subject to judicial review, but before a court may uphold such a decision, the appropriate governing body must be able to demonstrate that environmental factors were considered in a manner sufficient to amount to prima facie compliance with the procedural requirements of SEPA. *See Hanly v. Mitchell,* 460 F.2d 640 (2d Cir. 1972).

In the case at bar, although the trial court determined that the issuance of the grading permit did not constitute a major action significantly affecting the quality of the environment, there is no showing that the responsible branch of state government, the City, made such a determination. The essential point is that SEPA requires the City, acting through its city council, actually to consider the various environmental factors. The change in the substantive law brought about by SEPA introduces an element of discretion into the making of decisions that were formerly ministerial, such that even if we assume, arguendo, that the issuance of a grading permit was, prior to SEPA, a ministerial, nondiscretionary act, SEPA makes it legislative and discretionary. We hold that the City failed to exercise its legislative discretion under SEPA, and consequently grading permit No. G-023 was issued in a manner contrary to law.

We therefore remand this case to the City for its determination of whether it is necessary to prepare an Environ-

mental Impact Statement before making a decision on the question of whether or not to issue KSG a grading permit. Only after the City has made such a determination will its decision as to the grading permit properly be subject to judicial review. If, in the event of such review, the City can affirmatively demonstrate prima facie compliance with the procedural requirements of SEPA, then the burden will fall upon the appellant, if the City's decision is adverse to appellant, or upon another proper party to prove the City's decision was invalid.

In view of the basis of our decision remanding to the City the issue of whether KSG may be issued a valid grading permit consistent with SEPA, we do not reach other issues based upon SEPA which are presented by the parties as to the merits of the City's issuance of grading permit No. G-023; however, in the interest of expediting any future litigation between the parties, we deem it necessary to resolve certain additional issues, not related to SEPA, in the remainder of this opinion.

SHORELINE MANAGEMENT ACT OF 1971

Appellant contends that the respondent KSG violated the provisions of SMA by failing to obtain the permit which RCW 90.58.140[6] requires for anyone undertaking a "substantial development"[7] on the "shorelines of the state."[8]

---

[6]RCW 90.58.140(2) provides: "No substantial development shall be undertaken on shorelines of the state without first obtaining a permit from the government entity having administrative jurisdiction under this chapter."

[7]RCW 90.58.030(3)(e) provides: " 'Substantial development' shall mean any development of which the total cost or fair market value exceeds one thousand dollars, or any development which materially interferes with the normal public use of the water or shorelines of the state; . . ."

[8]RCW 90.58.030(2)(c), (d), and (e) provide: " 'Shorelines of the state' are the total of all 'shorelines' and 'shorelines of state-wide significance' within the state;

" 'Shorelines' means all of the water areas of the state, including reservoirs, and their associated wetlands, together with the lands underlying them; except (i) shorelines of state-wide significance; (ii) shorelines on segments of streams upstream of a point where the mean

Appellant argues that such a permit is necessary because the marshland adjacent to Forbes Creek constitutes "associated wetlands" and therefore comes within the meaning of language in SMA.

The trial court rejected appellant's interpretation of SMA and concluded "[t]hat subject property is not wetlands or associated wetlands as that term is defined in the Shorelines Management Act, Supra." Conclusion of law No. 5. In this connection we find no specific statutory definition of the term "associated wetlands"; however, SMA defines "wetlands" or "wetland areas" in RCW 90.58.030(2)(f) as:

> those lands extending landward for two hundred feet in all directions as measured on a horizontal plane from the ordinary high water mark; and all marshes, bogs, swamps, floodways, river deltas, and flood plains *associated with* the streams, lakes and tidal waters which are subject to the provisions of this chapter; the same to be designated as to location by the department of ecology.

(Italics ours.) The trial court found as a fact "[t]hat subject property . . . is not less than 3/4 to one mile east of the highwater mark of Lake Washington." Finding of fact No. 12. Substantial evidence supports this finding; consequently, it is clear, at least on the face of the statute, that the Forbes Creek marsh does not come within the quoted definition of "wetlands" unless it is designated by the Department of Ecology to be "associated with" a body of water subject to the provisions of SMA.

The trial court looked to the Department of Ecology's rules and regulations for the department's designation of "wetlands," and found:

> The determination by the Department of Ecology that subject property is not wetlands or associated wetlands under the Shorelines Management Act is a proper and

annual flow is twenty cubic feet per second or less and the wetlands associated with such upstream segments; and (iii) shorelines on lakes less than twenty acres in size and wetlands associated with such small lakes;

" 'Shorelines of state-wide significance' means the following shorelines of the State: . . ." [The statute then describes specifically such shorelines of state-wide significance.]

reasonable determination by the Department of Ecology and the court also finds that the shorelands and wetlands of Lake Washington do not extend as far east of Lake Washington to include any portion of subject property.

Finding of fact No. 42. The trial court concluded:

That the rules and regulations adopted by the Department of Ecology, specifically WAC 173-22-010 through 070 *et seq.*, is [*sic*] a valid and enforceable regulation of the Department of Ecology adopted pursuant to said Agency's regulatory authority, as provided for by the Shorelines Management Act.

Conclusion of law No. 4;

That in any event the City of Kirkland in exercising its local authority under the Shoreline Management Act had a right to rely upon the designation made by the Department of Ecology as to wetlands associated with Lake Washington, a shoreline of state-wide significance.

Conclusion of law No. 5A;

That the certain unnamed stream which happens to traverse subject property, having only a mean annual flow of 4 cubic feet per second, is not subject to the regulations and provisions contained in the Shorelines Management Act and that the Department of Ecology has no jurisdiction under the Shorelines Management Act over said stream or the abutting land in the immediate vicinity of subject property by reason of the existence of said stream.

Conclusion of law No. 6. Thus a narrow statement of the statutory interpretation problem presented to this court is as follows: The marshland adjacent to Forbes Creek on KSG's property is a "wetland" subject to the provisions of SMA *only* if we can say that the trial court erred in concluding, based upon the failure of the Department of Ecology to make a contrary designation, that such marshland area is *not* associated with Lake Washington.

Appellant attacks the failure of the Department of Ecology to include the Forbes Creek marsh on the subject property in its definition of "wetlands" and "associated wetlands" as an erroneous administrative interpretation which

is unscientific and contrary to the spirit and letter of SMA. Appellant asks this court to correct such alleged erroneous interpretation and thus to require KSG to obtain a permit under SMA. Appellant also requests us to direct the City to initiate proceedings to prevent any further activity by KSG on "wetlands" until such a permit has been applied for and obtained. Appellant argues that the undisputed testimony of its expert witnesses establishes that Forbes Creek marsh is an "associated wetland" entitled to the protection of SMA because (1) the marsh is a "wetland" in both the everyday and the scientific sense, which was conceded by the Department of Ecology; (2) the marsh has direct surface water, subsurface water, and marshland habitat connections to the lake; (3) the marsh is a part of the same ecological system as Lake Washington; and (4) this system allows nutrient flow and includes interrelated plant and animal communities.

We recognize the persuasiveness of appellant's arguments and the effect any interpretation of "associated wetlands" will have on areas other than that of Forbes Creek and its adjacent marshlands, but it is not our role to balance the respective interests of the members of the Juanita Valley Community Association, whose primary concern appears to be preservation of a marshland area which they deem to be of great importance as a wildlife habitat, and the specific interest of the respondent landowners, who apparently plan to industrialize the subject property. At the same time, although we must be mindful of the practical problems facing the Department of Ecology in designating the areas to be covered by SMA and in otherwise administering its responsibilities under the statute, we cannot permit such problems to color our interpretation of the legislation. Moreover, this court will not substitute its judgment for that of the legislature as to what would be the best use of the Forbes Creek marshland area. Our role is to interpret SMA in a manner consistent with legislative intention and purpose.

Appellant contends that because the stated policy of SMA is to

provide for the management of the shorelines of the state by planning for and fostering all reasonable and appropriate uses. . . . This policy contemplates protecting against adverse effects to the public health, the land and its vegetation and wildlife, and the waters of the state and their aquatic life . . .

RCW 90.58.020, and because the legislature has directed that the statute "shall be liberally construed to give full effect to the objectives and purposes for which it was enacted," RCW 90.58.900, the words "associated with" in the definition of "wetlands" and "wetland areas" in RCW 90.58.030(2)(f) should be interpreted in a manner to include the subject property and thereby afford the maximum protection to the public and the environment.

While the courts of this state must be constantly mindful of the policy stated in the act and of the liberal construction its terms must be given toward the end of preserving the natural environment for the people of the state of Washington and posterity, the fact remains that the legislature specifically directed the Department of Ecology to designate the "marshes, bogs, swamps . . . associated with the streams, lakes and tidal waters" subject to the provisions of SMA. RCW 90.58.030(2)(f). Pursuant to this statutory direction, the Department of Ecology adopted Washington Administrative Code chapter 173-22 which includes a series of maps designating "associated wetlands" throughout the entire state. As the trial court found, these maps do not include the marshlands adjacent to Forbes Creek on respondent KSG's property. At trial, the Department of Ecology offered testimony as to the criteria used in designating the "associated wetlands." A witness from the department, Mr. Mack, testified:

Q . . . What criteria did you use in deciding whether or not to designate an area as a wetland? A The basic criteria we used was that the wetland area or a marshy area would be essentially at the same level as the major

body of water, and also that it would have a direct sur-
face connection.

Appellant argues with considerable force that there is no
scientific justification for the use of such an "at grade"
requirement. Thus, appellant points to the testimony of
geologist Burke who stated:

> In other words, the nutrient flow to the lake, the interre-
> lationship to the plant and animal communities do not
> depend on a zero grade. If we had a very high gradiant
> here, this might be a factor. But not with what we have
> here at all.

The appellant insists that in the absence of any scientific
justification for adopting such a "zero grade" interpretation
of the meaning of "associated with," the regulations
adopted by the Department of Ecology are inconsistent
with the framework and policy of SMA.

■ We recognize that the power of an administrative
agency to promulgate rules is not unlimited and such an
agency may not legislate under the guise of its rule-making
power. *State ex rel. West v. Seattle,* 50 Wn.2d 94, 309 P.2d
751 (1957). Administrative rules may not amend or change
enactments of the legislature. *Pringle v. State,* 77 Wn.2d
569, 464 P.2d 425 (1970). We also observe, however, that
the appellant's own expert witness, Professor Orians, dem-
onstrated by his testimony that reasonable men could differ
in their opinions as to what areas should be designated as
part of the "associated wetlands" of Lake Washington. Pro-
fessor Orians stated:

> These boundary decisions, as you know, what is a wet-
> land and what is not associated wetland are always some-
> what arbitrary. And decisions are often made on terms of
> administrative convenience as much as anything else. For
> example, there is nothing magic about 20 cubic feet per
> second as opposed to 25 or 15, as far as I know. Simply at
> some point the resources of the State agencies such as the
> Department of Ecology that have to worry about these
> matters and simply cannot be diluted down to handling
> two and three and five cubic feet per second streams.
> You just don't have the energy, the manpower and the

resources to handle this. You wish to concentrate your attentions naturally on bigger bodies of water. So that you make some sort of arbitrary cut-off.

Where there is such a clear basis for a difference of opinion by reasonable men, we cannot conclude that an administrative decision is arbitrary or capricious, or that it constitutes an abuse of discretion. "Where there is room for two opinions, action is not arbitrary or capricious when exercised honestly and upon due consideration, even though it may be believed that an erroneous conclusion has been reached." *DuPont-Ft. Lewis School Dist. 7 v. Bruno*, 79 Wn.2d 736, 739, 489 P.2d 171 (1971); *see also Ancheta v. Daly*, 77 Wn.2d 255, 461 P.2d 531 (1969).

█ Further, as previously noted, SMA defines "shorelines" in RCW 90.58.030(2)(d) as follows:

"Shorelines" means all of the water areas of the state, including reservoirs, and their *associated wetlands,* together with the lands underlying them; except . . . (ii) shorelines on segments of streams upstream of a point *where the mean annual flow is twenty cubic feet per second or less* and the wetlands associated with such upstream segments . . .

(Italics ours.) It is obvious that the legislature, by making such a specific and arbitrary designation, was seeking to delineate with care the geographic coverage of the act. Similarly, it is apparent that the Department of Ecology's approach is consistent with such legislative intent. The department's designation of areas having a surface water connection at grade essentially guarantees protection under SMA to bodies of water having a close physical proximity to their respective "associated wetlands." Under such a "zero grade" test, each body of water and its "associated wetlands" will share the same water, the water quality of one will affect the other, and there will be a visual and esthetic connection between the two.

It is also significant that RCW 90.58.030(2)(d) excludes from coverage under SMA those streams having a mean annual flow of 20 cubic feet per second or less. Substantial evidence supports the trial court's finding that Forbes Creek

flows well below that rate, at a rate of no more than 4 cubic feet per second. Thus, if we were to conclude that the area in question should be designated an "associated wetland," as appellant would have us do, we would in effect be expanding that term to include areas which were specifically excluded from coverage under SMA by the legislature. Under such circumstances, we cannot say that the Department of Ecology's regulations fall outside the framework and policy of SMA.

There is an additional problem in appellant's reasoning. Appellant contends that the environment is a continuum. This is true. An ecological connection exists between the Pacific Ocean and the smallest stream in eastern Washington. When lesser distances are involved, such as the three-fourths to one mile between Lake Washington and the subject property involved in this case, there is a closer ecological connection. There is an even closer ecological connection between areas having a surface connection at grade, and these are the areas designated under SMA by the Department of Ecology. So even though it may not make perfect ecological sense to draw a line across this continuum, as the legislature did with its 20 cubic feet per second cut-off point, that is apparently what the legislature expected the Department of Ecology to do by delegating to the department the authority to designate "associated wetlands" and, as we noted previously, there is nothing to indicate that the department acted improperly under that authority. In this regard, it is notable that there is no indication in the legislation that the designation of "associated wetlands" should be based solely on ecological factors. On the contrary, factors such as physical proximity, practical recreational use, and increased public access are also involved. *See* RCW 90.58.020. We conclude that the trial court correctly determined the subject property to be outside the scope of SMA.

## APPLICABILITY OF ORDINANCE No. 2183

Appellant's next contention challenging the validity of KSG's grading permit No. G-023 rests upon the assertion

that the City's new zoning code, ordinance No. 2183, which became effective after KSG applied for the grading permit but prior to its issuance, was applicable to KSG's landfilling and excavating activities. Appellant argues that the trial court erred in failing to declare grading permit No. G-023 invalid because KSG did not obtain the "unclassified use permit" required by ordinance No. 2183.

The trial court's findings, although many of them are disputed by appellant, are nevertheless supported by substantial evidence and disclose that the facts pertinent to the possible applicability of ordinance No. 2183 are as follows: On April 18, 1960, ordinance No. 803 was passed which specifically provided that KSG's "present gravel pit operation" on the subject property was to cease "when 500,000 cubic yards of sand and gravel have been removed or on or before June 1, 1965, whichever is sooner." As previously noted, on March 31, 1972, when KSG filed its application for a grading permit, the only city ordinance regulating grading or excavating and providing for permits was section 21.08.070 of the municipal code, which amended and adopted by reference chapter 70 of the Uniform Building Code, and on May 24, 1972, KSG met all of the terms and conditions of that ordinance. The trial court also found that "on May 26, 1972, the City of Kirkland adopted a new zoning code requiring a 'non-classified use' permit before grading or excavating to a depth over 3 feet"[9] (finding of fact No. 21) and that "no Non-classified Use Permit was applied for or issued by the City of Kirkland to Kirkland Sand & Gravel prior to the issuance of the Grading Permit." Finding of fact No. 25.

The trial court determined that the law which controls KSG's application for a grading permit is the ordi-

[9]Defendant's exhibit No. 17 which is a copy of the new zoning code indicates that the required permit is known as an "unclassified use permit." Appellant's brief points out and it is not disputed that the trial court erred as to the date of adoption of the new zoning code. In fact, it was adopted May 15 and became effective May 29, 1972. However, such error as to date is not material to a determination of the question under discussion.

nance in effect when the application was filed on March 31, 1972, namely chapter ;70 of the Uniform Building Code adopted by the City. The court concluded:

That the new zoning code of the City of Kirkland having been adopted after Kirkland Sand & Gravel had made application for a Grading Permit and met all conditions necessary to obtain said permit, said ordinance has no effect on the issue of whether or not the Grading Permit G-023 is valid and enforceable.

Conclusion of law No. 10. Appellant's argument to support its claim that the trial court was incorrect in so concluding is basically threefold: First, that the critical date to be used in determining which ordinance applies is the date the application is *complete,* not the date the application was filed, and there is no substantial evidence to support a finding that the application was complete at any time prior to the effective date of ordinance No. 2183; second, that the "vested right" doctrine, as enunciated in *State ex rel. Ogden v. Bellevue,* 45 Wn.2d 492, 275 P.2d 899 (1954), and relied upon by the trial court, simply does not apply to a grading permit; and third, assuming arguendo that it does, the application is inconsistent with the 1960 ordinance No. 803 which was applicable at the time KSG applied for the grading permit.

The trial court properly rejected appellant's arguments and correctly ruled that the zoning ordinance requirements which control KSG's application for a grading permit were those in effect on March 31, 1972, the date the application was filed. First, we are satisfied that there is substantial evidence to support the trial court's finding

That on May 24, 1972, Kirkland Sand & Gravel met all the terms and conditions of Chapter 70 of the Uniform Building Code with respect to their application to grade the aforementioned real property.

Finding of fact No. 20. Thus KSG's grading permit application was filed and completed prior to May 29, 1972, the effective date of ordinance No. 2183. Further, we agree with the trial court that the "vested right" doctrine is

applicable such that, even if the original application were defective in some manner, a grading permit properly may issue provided the application is subsequently modified or completed to bring it into conformance with the applicable ordinances. *See State ex rel. Klappsa v. Enumclaw,* 73 Wn.2d 451, 439 P.2d 246 (1968); *Beach v. Board of Adjustment,* 73 Wn.2d 343, 438 P.2d 617 (1968).

Second, with regard to the specific applicability of the "vested right" doctrine to a grading permit application, it is not disputed that an applicant for a building permit has a vested right in the permit which accrues at the time the application is made. *Pierce v. King County,* 62 Wn.2d 324, 382 P.2d 628 (1963); *State ex rel. Kuphal v. Bremerton,* 59 Wn.2d 825, 371 P.2d 37 (1962); *Hull v. Hunt,* 53 Wn.2d 125, 331 P.2d 856 (1958); *State ex rel. Ogden v. Bellevue, supra.* The doctrine has also been held applicable to an application for a conditional use permit. *Beach v. Board of Adjustment, supra.* Appellant argues that the "vested right" doctrine has never been held to apply to a grading permit but, in the context of that doctrine, we see no rational distinction between building or conditional use permits and a grading permit.

In making its argument, appellant relies upon *Hass v Kirkland,* 78 Wn.2d 929, 481 P.2d 9 (1971), which upheld the city's refusal of a building permit because the landowner refused to comply with the provisions of a fire code in effect on the date of his application. The court, in *Hass,* quoting from *Seattle v. Hinckley,* 40 Wash. 468, 82 P. 747 (1905), said in part at page 931, " 'There is no such thing as an inherent or vested right to imperil the health or impair the safety of the community.' " The court noted that any "vested right" Hass otherwise had in the building permit was extinguished through the city's proper exercise of its police power to protect public health and safety. Appellant suggests that the *Hass* case may signal an end to the "vested right" doctrine. We do not so interpret *Hass,* nor do we regard it as an erosional retreat from the "vested right" doctrine announced in *Ogden* and followed in a long line of

cases. The only issue involved in *Hass* was the validity of a fire code provision which was in effect on the day that the building permit was applied for and our state Supreme Court simply upheld the city's refusal of the building permit because Hass had failed to comply with all applicable ordinances, specifically the fire code provision. No such situation is presented in the case at bar inasmuch as KSG complied with all ordinances applicable to its grading permit application.

The final portion of appellant's 3-pronged argument is that KSG's application for a grading permit did not vest any rights because it was not consistent with ordinance No. 803 which was enacted in 1960 when KSG's property was annexed to the City. Appellant argues that KSG's "present gravel pit operation" should have been discontinued after 500,000 cubic yards of sand and gravel had been removed but no later than June 1, 1965. Appellant's argument is defeated by the trial court's finding of fact, based upon substantial evidence, that the "present gravel pit operation" referred to in ordinance No. 803 did cease in a timely manner. This finding was based upon the trial court's evaluation of evidence that the processing activities in effect when ordinance No. 803 was enacted were completely different from subsequent activities, including those taking place at the time of KSG's application for the grading permit. We are bound by such finding.

For the reasons stated, we conclude the trial court correctly determined that ordinance No. 2183 was not applicable to KSG's March 31, 1972 application for the grading permit here in question.

Appellant's fourth major theory presented on this appeal is that the city council's action in approving the grading permit violated the "appearance of fairness" doctrine because of an apparent conflict of interest on the part of one of the councilmen. *See Anderson v. Island County*, 81 Wn.2d 312, 501 P.2d 594 (1972); *Fleming v. Tacoma*, 81 Wn.2d 292, 502 P.2d 327 (1972); *Smith v. Skagit County*, 75 Wn.2d 715, 453 P.2d 832 (1969). This contention need not

be considered in view of our decision to remand and because such problem is unlikely to arise a second time as to the parties herein.

Appellant also seeks an award for attorney's fees and expert witness' costs. Our state Supreme Court has consistently held:

> In absence of contract, statute, or recognized ground of equity, a court has no power to award an attorney's fee as part of the costs of litigation.

*State ex rel. Macri v. Bremerton,* 8 Wn.2d 93, 113, 111 P.2d 612 (1941); *Armstrong Constr. Co. v. Thomson,* 64 Wn.2d 191, 390 P.2d 976 (1964). It is conceded that SEPA contains no authorization for such relief. Therefore, unless we consider appellant a "private attorney general" acting to further the legislative policy of SEPA, *see Newman v. Piggie Park Enterprises, Inc.,* 390 U.S. 400, 19 L. Ed. 2d 1263, 88 S. Ct. 964 (1968); *Lee v. Southern Home Sites Corp.,* 444 F.2d 143 (5th Cir. 1971); and *La Raza Unida v. Volpe,* 337 F. Supp. 221 (N.D. Cal. 1971), which we decline to do in this case, any claim for attorney's fees and expert witness' costs may be granted only under SMA which contains this provision:

> In addition to such relief, including money damages, the court in its discretion may award attorney's fees and costs of the suit to the prevailing party.

RCW 90.58.230. Inasmuch as we have determined appellant is not entitled to relief under SMA, we must deny its request for attorney's fees and expert witness' costs.

We also decline to grant KSG's request for attorney's fees on appeal, pursuant to RCW 90.58.230.

██ Finally, appellant's assignments of error to findings of fact not resolved in connection with the arguments discussed herein, and to conclusions of law Nos. 2 and 3 dismissing city officials Gerald Link and Ralph Thomas as individually named defendants, are not supported either by argument or citation of authority and therefore will not be considered. *Ocean Spray Cranberries, Inc. v. Doyle,* 81

Wn.2d 146, 500 P.2d 79 (1972); *Wagner v. Wagner*, 1 Wn. App. 328, 461 P.2d 577 (1969).

Because neither party obtained the relief sought, nor specifically contended in this court for the relief granted, *i.e.*, a remand to the City, each party shall bear its own costs. *See Department of Highways v. King County Chapter, Wash. Environ. Council*, 82 Wn.2d 280, 510 P.2d 216 (1973).

The cause is reversed in part and remanded for further proceedings consistent with this opinion.

FARRIS and JAMES, JJ., concur.

Petition for rehearing denied September 18, 1973.

Review denied by Supreme Court November 20, 1973.