**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

FILED
6/12/2023
Court of Appeals
Division I
State of Washington

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | |
|---|---|
| KING COUNTY, a political subdivision of the state of Washington, | No. 83905-5-I |
| Petitioner, | ORDER DENYING MOTION FOR RECONSIDERATION AND WITHDRAWING AND SUBSTITUTING OPINION |
| v. | |
| FRIENDS OF SAMMAMISH VALLEY, a Washington nonprofit corporation; and FUTUREWISE, | |
| Respondents. | |

The respondents, Friends of Sammamish Valley and Futurewise, have filed a motion for reconsideration of the opinion filed on February 27, 2023. King County, has filed a response. The court has considered the motion, and a majority of the panel has determined that the motion should be denied but the opinion should be withdrawn and a substitute opinion filed; now, therefore, it is hereby

ORDERED that the motion for reconsideration is denied; and it is further

ORDERED that the opinion filed on February 27, 2023 is withdrawn; and it is further

ORDERED that a substitute published opinion shall be filed.

_____
Birk, J.

_____
Mann, J.

_____
Dwyer, J.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| KING COUNTY, a political subdivision of the state of Washington, | No. 83905-5-I |
| Petitioner, | DIVISION ONE |
| v. | PUBLISHED OPINION |
| FRIENDS OF SAMMAMISH VALLEY, a Washington nonprofit corporation; and FUTUREWISE, | |
| Respondents, | |
| A FARM IN THE SAMMAMISH VALLEY LLC; MARSHALL LEROY d/b/a Alki Market Garden; EUNOMIA FARMS, LLC; OLYMPIC NURSERY INC.; C-T CORP.; ROOTS OF OUR TIMES COOPERATIVE; REGENERATION FARM LLC; HOLLYWOOD HILLS ASSOCIATION; TERRY and DAVID R. ORKIOLLA; and JUDITH ALLEN, | |
| Defendants. | |

BIRK, J. — King County (County) adopted Ordinance 19030 (Ordinance), amending its land use code governing winery, brewery, and distillery (WBD) facilities. Friends of Sammamish Valley (FoSV) and Futurewise, among others, challenged the Ordinance before the Growth Management Hearings Board for the Central Puget Sound region (Board). FoSV and Futurewise contend that proliferation of WBDs in the Sammamish Valley would have significant

No. 83905-5-I/2

environmental consequences that the County failed to recognize and evaluate. The Board agreed and invalidated most of the Ordinance. We conclude that when its limitations are properly interpreted, Ordinance 19030 is not likely to lead to the development FoSV and Futurewise predict, and the County was correct in issuing a determination of nonsignificance that the Ordinance will not have a probable significant adverse environmental impact. We reverse the Board's order of invalidity and remand for entry of a finding of compliance with the Growth Management Act (GMA), chapter 36.70A RCW, and the State Environmental Policy Act (SEPA), chapter 43.21C RCW.

I

A

Although Ordinance 19030 amends the King County Code applicable throughout the county, the parties focus on its impact in the Sammamish Valley. This area runs from Redmond, Washington, northward along State Route 202 toward Woodinville, Washington. To the west of the Sammamish Valley lie incorporated areas of the cities of Redmond, Kirkland, and Woodinville. The Sammamish Valley includes lands zoned agricultural in a designated agricultural production district. The "broad Sammamish River Valley trough" includes a migratory salmon river and prime farmland. To the east of the agricultural area lie upslope lands zoned rural area. Upland areas to the east drain through 11 mapped small creeks down the valley slopes and into the Sammamish River. Upland drainage potentially affects agricultural land in the valley if increased drainage

2

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

leads to the land being waterlogged. Drainage also potentially affects the suitability of the river as a wildlife habitat.

Woodinville has become a destination known for its wineries and tasting rooms. Eastern Washington is recognized as a grape growing region for wine. In some cases, grapes from Eastern Washington have been transported to the Woodinville area for fermenting and processing. Numerous wineries, breweries, and distilleries have located inside the Woodinville city limits. Within its limits, Woodinville provides urban services such as water, sewer, police, fire, traffic control, and surface water management. Historically, a few wineries were established outside the Woodinville city limits, in unincorporated King County. The appropriateness and legal status of these establishments was disputed in submissions to the County during its consideration of Ordinance 19030.

In September 2016, the County published the "Sammamish Valley Wine and Beverage Study" (Study). The Study's stated primary objective was to develop County policy and code recommendations for economic development, transportation, land use, and agriculture. The study area included Woodinville, Kirkland, Redmond, rural areas, and agricultural production districts. The Study found that wine production grew steadily from 1990 to 2013. Although King County was found to be the second largest producer of wine in Washington, it is not noted as a grape growing region and the wineries and tasting rooms in the County are largely representative of wineries using grapes from Eastern Washington. The Study found that Woodinville is one of two hubs in Washington for wine related

retail. The Study was identified as part of the background for Ordinance 19030. The Study was followed by a 2018 "Action Report" that was described as the "County's response to the policy recommendations outlined in [the Study]." The Action Report included discussion of both transportation and agriculture in the Sammamish Valley.

In 2017 and 2018, local residents documented in submissions to the County that it had entered into agreements with property owners in the Sammamish Valley concerning alleged nonconforming uses of their properties for adult beverage businesses. One letter identified eight businesses in unincorporated King County just outside Woodinville city limits that were asserted to be operating as "Tasting Rooms" in violation of the King County Code with alleged pending code violations in late 2019. Opponents of Ordinance 19030 asserted the prospect the County might relax code requirements and permit new adult beverage business in the unincorporated areas was resulting in land speculation, driving up prices into a range that would make agricultural or traditional rural uses not cost effective.

Among the asserted code violations predating Ordinance 19030 was an online review of Castillo de Feliciana Vineyard and Winery LLC complaining about the establishment's reliance on a "porta potty for [a] bathroom," to which the business replied it was "required by [the] County to have all patrons on Friday nights" use portable toilets. A newspaper referenced Sal Leone, owner of a wine tasting room asserted to be "running afoul of [the] County for operating in an area set aside for agriculture," who appealed and "says if he doesn't win, he'll get stinky

4

No. 83905-5-I/5

pigs and loud roosters for rural ambience." In a news story, the owners of Chateau Lill Events LLC reportedly stated, "[T]here simply hasn't been enough space" at their location "to produce wine," so "the tasting room and event facility has been separate" and it was " 'already a stretch to call it a winery.' "

In another case, the County served a notice and order on Icarus Holdings LLC and Vladen Milosavljevic. The County alleged proposed and existing construction and businesses violated the subject property's zoning as agricultural. At a contested hearing, the hearing examiner declined to reach whether plans for a winery and distillery use were consistent with code, because the plans had not yet come to fruition and "the zoning code is in flux, with extensive pending legislation on wineries and distilleries." The hearing examiner concluded a bakery on the site appeared to violate code, because it was not allowed in the agricultural zone and it appeared to exceed the scope of a previous owner's permit for "retail agricultural products." However, the hearing examiner allowed the bakery to continue while the owners transitioned to a legal use.

Several documents were submitted in regard to "Matthews Estate" (Matthews),[1] including its construction of a 3,000 gallon holding tank for on-site sewage disposal; stormwater pollutant violations dating back to 2006 associated

---

[1] Throughout the record, the establishments owned by Cliff and Diane Otis are referred to under several different names, including Matthews Estate Winery – Rubstello/Otis LLC, Matthews Estate, Tenor Wines LLC, and Rubstello/Otis LLC. For consistency, we refer to this group of establishments collectively as "Matthews."

with fermentation tanks and effluent from grape crushing;[2] a 2012 citation for conversion of a garage into business space for wine production, a tasting room, and an office without required permits and holding "Events/Concerts" without an approved temporary use permit; and an agreement by Matthews not to protest sewer extension if it becomes available. In an enforcement case, the owners of Matthews entered into a settlement agreement with the County in anticipation of pending adult beverage code changes.

Over a weekend in late August 2017, Matthews hosted what one resident described as "[t]he outrage of the 'White Party,' " photographs of which depicted bumper-to-bumper traffic blocking the road "for hours," open land filled with cars parking under a cloud of dust, portable toilets, food trucks, King County sheriff deputies directing guests across the road, and an assemblage of persons in all-

---

[2] Opponents relied on an August 3, 2009 letter ostensibly written by Douglas D. Navetski, supervising engineer with King County's Water Quality Compliance Unit. In the letter, Navetski directed Matthews to stop flushing the processing area of crushed grapes toward the road drainage system, and instead "collect and contain the process water from this grape crushing activity and dispose to your onsite septic system." In response to a motion by King County in this matter, FoSV points to a letter filed in the clerk's papers for King County v. Friends of Sammamish Valley, No. 84659-1-I (Wash. Ct. App. Feb. 12, 2021). The letter is dated February 12, 2021 and is from Katelynn Piazza, SEPA Coordinator with the state Department of Ecology, to Ty Peterson with the County's permitting division and the responsible official who issued the determination of nonsignificance for Ordinance 19030. Id. Piazza's 2021 letter indicates that "[s]tate law does not allow wastewater from alcohol production to be treated in onsite systems that are designed to treat wastewater from toilets, shower and kitchens." Id. Piazza concludes the SEPA checklist for Ordinance 19030 "should also identify potential impacts of wastewater disposal on drinking/groundwater from rural WBD businesses." Id. Piazza's letter outlines options WBD facilities could use to dispose of wastewater, though the letter states they are "expensive and entail significant effort." Id.

white attire, and which was reported as having "attracted about 1,500 millennials" and involved "parking 500 to 600 cars across the street on farmland." A resident told the County that "up until 2016 the 'wineries' were having music past midnight" and Matthews is not a winery but a "wine bar." The County became aware that Matthews was referred to as a "nightclub" in an online review.

On March 28, 2018, the County sent a letter to Matthews's owners notifying them that it had verified a complaint of an expansion of their business. The County viewed Matthews's use of a grass area for wine business related activities as an expansion contrary to the settlement agreement. The County noted the property continued to be used for events and activities, which required a temporary use permit the owners had not requested. The County concluded these violations breached the settlement agreement, advised Matthews's owners to cease using the grass area for winery activities, and advised Matthews's owners to submit a temporary use permit application for events occurring on the property. In response to a letter from the owners' attorney, the County paused enforcement action pending an updated adult beverage ordinance.

B

On April 24, 2019, the County published its SEPA environmental checklist (Checklist). The Checklist relied on both the Study and the Action Report. The Checklist stated Ordinance 19030 was a nonproject action that is not site specific and would apply throughout unincorporated King County. For section B of the Checklist, which constituted most of the Checklist, the majority of the responses

concerning the environmental elements of the proposal were "not applicable for this nonproject action." In response to a question asking about proposed measures to ensure the proposal is compatible with existing and projected land uses and plans, the County wrote, "The proposed regulations appropriately regulate WBD land uses consistent with the Comprehensive Plan. The proposal will go through environmental review and a public hearing process, before being acted on by the King County Council." In the supplement to the Checklist, the County noted that the "proposal generally increases the regulations on winery, brewery, and distillery uses, and is not expected to increase discharges to water, emissions to air or production of toxic or hazardous substances." It also noted that existing regulation on various environmental considerations, such as discharge to water, emission to air, production of noise, and effects on plants and wildlife, are already covered by existing applicable regulation on these activities. The Checklist stated Ordinance 19030 was not expected to conflict with or change any requirements for protection of the environment.

On April 26, 2019, the SEPA responsible official, Ty Peterson, issued a determination of nonsignificance (DNS). Peterson reviewed the Checklist and other information on file, considered the extent to which the proposed ordinance will cause adverse environmental effects in excess of those created by existing regulations, and considered mitigation measures that the agency or proponent will implement as part of the proposal. Peterson found the available information was reasonably sufficient to evaluate the environmental impact of the proposed

8

ordinance and concluded that the proposed ordinance will not have a significant impact to current or continued use of the environment.

In May 2019, Peterson received several e-mails and letters from interested parties, including FoSV and Futurewise, on the proposed ordinance and its DNS. Futurewise argued that basing the DNS on a Checklist deferring analysis of impacts by labeling the action as nonproject was error and that some aspects of the proposed ordinance were more specific than nonproject actions. FoSV requested the DNS be withdrawn and an environmental impact statement (EIS) be prepared. Barbara Lau, an environmental scientist, opined the proposed ordinance would legalize existing illegal businesses and authorize new development that would cause significant environmental impacts. Roberta Lewandowski, a former planning director and SEPA responsible official for the city of Redmond, concluded the DNS was not appropriate. Lewandowski stated the proposed ordinance had an after-the-fact approach of looking backward to discover environmental impacts, which did not comply with the spirit or requirements of SEPA. Lau and Lewandowski documented impacts that new development in the Sammamish Valley could have on the environment and agriculture.

On June 10, 2019, Peterson sent a memorandum to Erin Auzins, the King County Council's supervising legislative analyst, explaining his decision to issue the DNS. Peterson stated he reviewed the Checklist, proposed ordinance, existing codes, regulations and policies, associated studies, and public comments that

No. 83905-5-I/10

were received after the DNS was issued and published. Peterson believed project level impacts could not be anticipated with responsible certainty and attempting to do so would result in "gross speculation." Peterson characterized the proposed ordinance as making "relatively minor" amendments that would not necessarily allow for the reasonable anticipation of probable environmental impacts. Peterson opined the majority of public comments failed to recognize that the proposed ordinance amended existing regulations and the majority of amendments placed restrictions that had not previously existed on WBD uses. Peterson considered the potential for a likely significant impact or probable adverse impact[3] when he reviewed existing conditions, the scope of this nonproject action, and whether existing regulations mitigate any potential impact. Peterson listed 11 areas of environmental regulatory protection or code that the proposed amendments did not change and that would apply to any new development. Peterson found that potential impacts of concern identified in public comment would be most appropriately analyzed at the project level. Peterson characterized the public comments as concerning character, policy, philosophical, growth management, and land use arguments, as opposed to identifying unmitigated environmental impacts likely to result from the code changes.

---

[3] Peterson's memorandum used the phrase "more than probable adverse environmental impact" in reference to an agency's threshold determination process. This appears to be a typographical error. Peterson also described the threshold determination as requiring consideration of any "likely" significant impact, and he cited WAC 197-11-330. There the code directs the agency to "[d]etermine if the proposal is likely to have a probable significant adverse environmental impact." WAC 197-11-330(1)(b). There is no information suggesting, and the parties do not argue, that Peterson did not apply the proper standard.

No. 83905-5-I/11

C

The County adopted Ordinance 19030 on December 4, 2019. Ordinance 19030 imposed a new license requirement on operating or maintaining an adult beverage business in unincorporated King County. Generally, Ordinance 19030 established a schedule for adult beverage businesses to become licensed, either through establishing a legal nonconforming use or through compliance with its new requirements.

Ordinance 19030 superseded preexisting code which had permitted "Winery/Brewery/Distillery" uses. The Ordinance replaced the former use with "Winery/Brewery/Distillery/Facility" uses I, II, and III. The Ordinance continued previous code that a WBD facility may be sited in agricultural areas only where the "primary" use is "Growing and Harvesting Crops" or "Raising Livestock and Small Animals." Under Ordinance 19030, there is a new requirement for WBD facilities in agricultural areas that 60 percent of the products processed must be grown on site. This is more restrictive than former code, which required WBD uses only to have 60 percent of the products processed grown in the Puget Sound counties, a regional designation that did not require such facilities to process anything grown on site.

Ordinance 19030 altered a former code restriction to tasting of products "produced on-site." Before, the code stated,

> Tasting of products produced onsite may be provided in accordance
> with state law.

11

No. 83905-5-I/12

Ordinance 19030 amended this to provide,

> Tasting <u>and retail sales</u> of products produced on-<u>site may <u>occur only</u>
> <u>as accessory to the primary winery, brewery, distillery production use</u>
> <u>and </u>may be provided in accordance with state law.

This code provision addresses "[t]asting" and "retail sales" in both agricultural and rural areas. In addition to the primary use requirement applicable in agricultural areas of growing crops or raising livestock, for "[t]asting" and "retail sales" this provision adds a new primary production use requirement applicable in both agricultural areas and rural areas.

Ordinance 19030 imposed other new regulatory requirements. One is that "[a]t least two stages of production of wine, beer, cider or distilled spirits, such as crushing, fermenting, distilling, barrel or tank aging, or finishing . . . shall occur on-site." One of the on-site stages must be "crushing, fermenting or distilling." The Ordinance's other new requirements include regulating floor area, operating hours, parking, licensure, events, impervious surfaces, lot size, water connection, and setbacks.

Ordinance 19030 established new provisions governing temporary use permits for events. In considering a temporary use permit, the County must consider building occupancy and parking limitations, and condition the number of guests allowed based on those limitations. The Ordinance imposed limits of 150 guests at a WBD II and 250 guests at a WBD III. In the rural area, Ordinance 19030 changed the temporary use permit limitation from two events per month to 24 days in any 1 year period.

No. 83905-5-I/13

There is an exception for which a temporary use permit is not required at WBD II and III facilities, if six conditions are satisfied regarding the business's liquor licensure, parcel size, setbacks, location in the rural area zone, access to an arterial or state highway, and hours of use of amplified sound. If a facility is not licensed as a WBD II or III and therefore cannot rely on the exception, a temporary use permit is required if any of seven conditions exist, including exceeding building occupancy, use of portable toilets, parking overflow, use of temporary stages, use of tents or canopies requiring a permit, traffic control, or exceeding allowed operating hours.

Ordinance 19030 created "Demonstration Project Overlay A" in 13 parcels within the rural area zone adjacent to Woodinville. This aspect of Ordinance 19030 uniquely allows "remote tasting rooms." Remote tasting rooms were not defined or explicitly allowed before Ordinance 19030, but Ordinance 19030 provided a means by which these uses can be regulated and licensed. The County acknowledged Demonstration Project Overlay A may result in additional traffic and congestion should new tasting rooms be developed beyond those existing before the Ordinance was adopted. However, the County noted events at remote tasting rooms are limited to two per year per parcel, and Ordinance 19030 limited the number of permitted attendees, making it more restrictive than the former code.

D

On March 4, 2020, FoSV filed a petition with the Board challenging Ordinance 19030 under the GMA and SEPA. On May 26, 2020, the Board granted

13

No. 83905-5-I/14

summary judgment for FoSV that Ordinance 19030 violated SEPA and substantially interfered with the fulfillment of the GMA's planning goals. The Board found the Checklist inadequate. The Board "remanded this matter to the County to achieve compliance" pursuant to RCW 36.70A.300. There, the GMA provides that in case of noncompliance with SEPA, the Board "shall remand the matter to the affected . . . county" and "specify a reasonable time . . . within which the . . . county . . . shall comply with" the GMA. RCW 36.70A.300(3)(b). The Board established November 6, 2020 as the due date for compliance.

On November 5, 2020, the County issue a new SEPA checklist (2020 Checklist) "in response to the Growth Management Hearings Board Order on Dispositive Motions . . . which granted the petitioners' summary judgment motion and invalidated most of the substantive sections of Ordinance 19030." The 2020 Checklist included a supplemental sheet for nonproject actions (Part D) and four attachments.

Attached to the 2020 Checklist, the County included a table comparing Ordinance 19030 with the former code and an impact summary highlighting the changes between the two versions of the code.[4] Only five parcels countywide that potentially could host WBD II or III facilities could hold events without a temporary use permit, and these parcels were known to already be or potentially be WBD facilities at the time Ordinance 19030 was adopted. The County noted the

---

[4] The County's response to FoSV's and Futurewise's motion for reconsideration in this court establishes that the table was based on and furthered analysis of code changes already included in the Action Report, which had been considered as part of the original DNS.

14

exemption could lead to a greater number and more frequent occurrence of events on these properties than might otherwise occur under the former code, "which could mean greater periodic traffic congestion, noise, or other impacts than would otherwise occur under the former code."

On April 16, 2021, the superior court reversed the Board's May 26, 2020 order after finding that the Board exceeded its statutory authority and the order was based on an improper application of the summary judgment standard. The superior court remanded with direction that the Board conduct a hearing on the merits, which the Board did. The Board issued its final, corrected decision on January 23, 2022. Now reviewing the County's revised 2020 Checklist, the Board again found the County had not prepared an adequate checklist under SEPA and again remanded for compliance under RCW 36.70A.300. The Board invalidated sections 12-29, 31, and map amendments No. 1 and No. 2 of Ordinance 19030 and remanded to the County for action to comply with several statutes and administrative requirements. King County filed an appeal from the Board's January 23, 2022 order in superior court, and the action was transferred to this court pursuant to RCW 34.05.518(1)(b).[5]

---

[5] On January 19, 2023, the County filed a "renewed motion for accelerated review" of this matter or alternately a stay of the appeal filed under Friends of Sammamish Valley, No. 84659-1-I. The motion discloses that pursuant to RCW 36.70A.330(1) and (2), the Board conducted a compliance hearing on August 15, 2022. The Board issued an order finding the County in continued noncompliance. Friends of Sammamish Valley, No. 84659-1-I (Sept. 8, 2022). The County appealed that order, and King County Superior Court transferred the matter to this court. Id. We deny as moot the County's motion for accelerated review in this matter, and we deny without prejudice the County's motion to stay Friends of Sammamish Valley, No. 84659-1-I.

No. 83905-5-I/16

II

The County argues the Board exceeded its jurisdiction by basing its GMA and SEPA analysis on alleged code violations of several existing businesses in the Sammamish Valley. The County argues that the GMA assigns the Board no authority to review site specific land use decisions and, further, that unadjudicated code complaints are unreliable for a GMA and SEPA analysis because even an accurate complaint may not result in a determination that the use is unlawful. The County argues the Board confused a use that is allowed but may not comply with all aspects of governing code, with a use that is illegal and cannot exist in compliance with code.

This distinction is supported by Seven Hills, LLC v. Chelan County, in which the court held that a county's resolution declaring a moratorium on siting new cannabis production and processing activities did not amend or replace existing ordinances, and Seven Hills established a nonconforming use before adoption of the resolution. 198 Wn.2d 371, 376, 495 P.3d 778 (2021). After the county changed the agricultural zoning laws, cannabis growing and processing became nonconforming uses. Id. at 398. The county argued that absent compliance with every required permit and license, a cannabis business could not continue operations after its moratorium. Id. at 397. However, while Seven Hills's failure to obtain a final inspection put them out of compliance with a building permit, it did not necessarily make the use unlawful. Id.

16

No. 83905-5-I/17

Under RCW 36.70C.040(1), land use petitions fall within the exclusive jurisdiction of superior courts. A "land use decision" means a final determination by a local jurisdiction's body or officer with the highest level of authority to make the determination on "[t]he enforcement by a local jurisdiction of ordinances regulating the improvement, development, modification, maintenance, or use of real property." RCW 36.70C.020(2)(c). Relevant here, the Board may review only petitions alleging "a state agency, county, or city planning . . . is not in compliance with the requirements of [the GMA], . . . as it relates to plans, development regulations, or amendments, adopted under [the GMA]." RCW 36.70A.280(1)(a). "Development regulations" are controls placed on development or land use activities by a county or city, including, among other things, zoning ordinances, official controls, and subdivision ordinances. RCW 36.70A.030(8).

We agree with FoSV that this case does not concern any final land use decisions, which are subject to review in superior court and not before the Board. A rezone involving a single site may fall within the Board's jurisdiction "if it implements a comprehensive plan amendment." Spokane County v. E. Wash. Growth Mgmt. Hr'gs Bd., 176 Wn. App. 555, 572, 309 P.3d 673 (2013). The development regulations at issue here fall within the Board's express statutory jurisdiction under RCW 36.70A.280(1)(a). This remains so when evaluating the effect of the development regulations for GMA and SEPA compliance involves considering whether new development at the affected site or sites may "disrupt[] the neighborhood's rural character" under the GMA or "could significantly affect

17

environmental quality" under SEPA. Id. at 577, 580. The Board did not exceed its jurisdiction by addressing the probable effects of Ordinance 19030 in regard to specific sites.

Additionally, FoSV argues that the Board did not exceed its jurisdiction in making statements about the legal effect of Ordinance 19030, asserting that the Ordinance legalizes, without appropriate consideration, existing operations that the County had cited as unlawful. Under SEPA, "for a nonproject action, such as a comprehensive plan amendment or rezone, the agency must address the probable impacts of any future project action the proposal would allow." Id. at 579. Substantial evidence does not support the conclusion that Ordinance 19030 legalizes previously illegal uses.

When applying for a license under Ordinance 19030, a person must certify the application under penalty of perjury and must include, "[f]or any adult beverage businesses attempting to demonstrate legal nonconforming use status[,] . . . documentation sufficient to establish that the requirements of [King County Code] Title 21A have been met," referring to the County's nonconforming use rules. If an adult beverage business was operating under an active Washington State Liquor and Cannabis Board license for its current location before Ordinance 19030 was effective and the County had not objected to that license, the operator can obtain an initial six month license and then, if the County determines the operator has taken "substantial steps" to document compliance with the County's nonconforming use rules, an additional six months. Thereafter, the County can

approve further licensure only if the applicant has established a legal nonconforming use, shows substantial steps toward doing so, or has conformed with the new requirements for a WBD I, II, or III or remote tasting room regulations. Ordinance 19030 requires operators to establish compliance with prior code or with Ordinance 19030's new requirements. The Board's order makes frequent reference to Ordinance 19030 allowing development "in contravention of current code," approving "*existing code violations*," or "removal of regulatory bans on previously illegal activities." With one exception, the Board nowhere points to an instance of a use it believes was illegal before Ordinance 19030 that would become legal under Ordinance 19030.

The exception is Demonstration Project Overlay A, which the Board asserts allows "uses that are not currently allowable." For Demonstration Project Overlay A, the Ordinance establishes new regulations governing floor area, operating hours, licensure, special events, and off-street parking. Although Ordinance 19030 contemplates that there will be ongoing evaluation and future permanent legislation, it does not mandate that future legislation occur. Remote tasting rooms in Demonstration Project Overlay A "may continue as long as an underlying business license or renewal is maintained." Ordinance 19030 "supersedes other variance, modification or waiver criteria" of the County zoning code. However, continuing a remote tasting room use remains "subject to the nonconformance provisions" of the County code. Within Demonstration Project Overlay A, as well, the Ordinance requires that businesses conform either to former code or to

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Ordinance 19030's new requirements. In both agricultural and rural areas, and in Demonstration Project Overlay A, businesses must show compliance with either former or current code.

The Board's decision does not identify any site it believed was not in compliance, the justification for that conclusion, or a reason to believe the nature of the noncompliance would have supported abatement by the County. Under Seven Hills, it does not follow that because a business was ostensibly not in compliance with a code provision, the County could succeed in code enforcement resulting in cessation of the activity. Some of the violations and alleged violations shown in the record concerned only certain activities on properties in the Sammamish Valley, not the broad assertion that the uses on site were illegal and could be subject to action to terminate them, and the possibility of nonconforming use is not addressed for any site. The record does not contain substantial evidence that the County had the ability under the former code to terminate any of the preexisting uses asserted by FoSV and Futurewise to be noncompliant.

The Board did not exceed its jurisdiction under the GMA because it did not conclude, and its record does not permit the conclusion, that any specific site's land use was legal or illegal.

III

The GMA requires that counties with specified populations adopt comprehensive growth management plans. Futurewise v. Spokane County, 23 Wn. App. 2d 690, 694, 517 P.3d 519 (2022) (citing former RCW 36.70A.040

No. 83905-5-I/21

(2014)). A jurisdiction's comprehensive plan must contain data and detailed policies to guide the use and development of land, as prescribed by the GMA. Id. Because of legislative compromises at the time of the enactment of the GMA, Washington courts do not grant the GMA liberal construction. Thurston County v. W. Wash. Growth Mgmt. Hr'gs Bd., 164 Wn.2d 329, 342, 190 P.3d 38 (2008). The Growth Management Hearings Boards are "charged with adjudicating GMA compliance and invalidating noncompliant plans and development regulations." Lewis County v. W. Wash. Growth Mgmt. Hr'gs Bd., 157 Wn.2d 488, 497, 139 P.3d 1096 (2006); RCW 36.70A.280, .302.

When a party challenges a development regulation before the Board, the regulation is "presumed valid upon adoption," RCW 36.70A.320(1), and the Board "shall find compliance unless it determines that the action by the state agency, county, or city is clearly erroneous in view of the entire record before the [B]oard and in light of the goals and requirements of [the GMA]," RCW 36.70A.320(3). To find an action clearly erroneous, the Board must have a firm and definite conviction that a mistake has been committed. Thurston County, 164 Wn.2d at 340-41. The Board's obligation to apply the "clearly erroneous" standard of review implements a legislative directive that the Board must "grant deference to counties and cities in how they plan for growth, consistent with the requirements and goals of [the GMA]." RCW 36.70A.3201. Before the Board, the party challenging an agency action has the burden of demonstrating failure to comply with the GMA. Thurston County, 164 Wn.2d at 341. Here, FoSV and Futurewise had the burden before the

21

No. 83905-5-I/22

Board to show that Ordinance 19030 was clearly erroneous in light of the record and the goals and requirements of the GMA.

The GMA provides that a party aggrieved by a final decision of the Board may appeal the decision in court pursuant to the Administrative Procedure Act (APA), chapter 34.05 RCW. RCW 36.70A.300(5) (citing RCW 34.05.514); Thurston County, 164 Wn.2d at 341. Under RCW 34.05.518, in circumstances the parties do not dispute exist here, the superior court may transfer review of a final decision of an agency to the Court of Appeals. We review a Board's order for substantial evidence, meaning a sufficient quantity of evidence to persuade a fair-minded person of the truth or correctness of the order. Thurston County, 164 Wn.2d at 341. On mixed questions of law and fact, we determine the law independently and apply it to the facts as found by the agency. Id. at 341-42. We review issues of law de novo. Id. at 341. We give "[s]ubstantial weight" to the Board's interpretation of the GMA, but the court is not bound by the Board's interpretations. Id.

Because of the legislative directive that the Board grant deference to the agency, "deference to county planning actions, that are consistent with the goals and requirements of the GMA, supersedes deference granted by the APA and courts to administrative bodies in general." Quadrant Corp. v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd., 154 Wn.2d 224, 238, 110 P.3d 1132 (2005). The Board's deference to an agency's action under the GMA ends when it is shown that the action is clearly erroneous. Id. However, if the Board's decision fails to apply the

22

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

deferential "clearly erroneous" standard to the agency action, then the Board's decision is not entitled to deference from the court.  Id.

The party appealing a Board decision has the burden of demonstrating the invalidity of the Board's action.  Thurston County, 164 Wn.2d at 341; Quadrant Corp., 154 Wn.2d at 233.  One ground on which an agency action may be challenged is that the agency erroneously interpreted or applied the law.  RCW 34.05.570(3)(d).  We review a question of law de novo under the "error of law" standard.  City of Redmond v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd., 136 Wn.2d 38, 49, 959 P.2d 1091 (1998).  Under the "error of law" standard, the court may substitute its own view of the law for the Board's.  Marcum v. Dep't of Soc. & Health Servs., 172 Wn. App. 546, 559, 290 P.3d 1045 (2012).  "If the Board's order correctly found that the [agency's] planning action was clear error, this court defers to the Board's determination of the GMA's requirements.  But if this court determines that the Board erred when it found clear error or did not give sufficient deference to the [agency], this court gives deference to the [agency's] planning action."  Heritage Baptist Church v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd., 2 Wn. App. 2d 737, 749, 413 P.3d 590 (2018).

Interpretation of a statute is a question of law we review de novo.  Ellensburg Cement Prods., Inc. v. Kittitas County, 179 Wn.2d 737, 743, 317 P.3d 1037 (2014).  "The primary goal in statutory interpretation is to ascertain and give effect to the intent of the Legislature."  Nat'l Elec. Contractors Ass'n v. Riveland, 138 Wn.2d 9, 19, 978 P.2d 481 (1999).  Statutory interpretation begins with the

23

No. 83905-5-I/24

statute's plain language and ordinary meaning.  Id.  We apply the same principles of interpretation to a county ordinance.  Ellensburg Cement Prods., Inc., 179 Wn.2d at 743.  We conclude the County has met its burden of showing that the Board erred in interpreting Ordinance 19030 and, as a result, the Board erred in assessing Ordinance 19030's compliance with the GMA.

A

The Board and the parties first have focused on Ordinance 19030's allowing WBD II and WBD III uses in areas zoned for agricultural uses.  The Board found that Ordinance 19030 failed to restrict agricultural accessory uses and activities to those that are consistent with the size, scale, and intensity of the existing agricultural use of the property and the existing buildings on the site in violation of RCW 36.70A.177(3)(b)(ii).  Futurewise argues WBDs cannot qualify as agricultural or nonagricultural accessory uses, in part because under Ordinance 19030 only two of the five production steps are required to take place on site.

RCW 36.70A.177 permits counties to use "innovative zoning techniques" in areas designated as agricultural lands of long-term commercial significance.  RCW 36.70A.177(1).  One such technique is to allow "accessory uses."  RCW 36.70A.177(2)(a).  King County Code 21A.06.013 defines "accessory use" as "a use, structure or activity that is: (A) Customarily associated with a principal use; (B) Located on the same site as the principal use; and (C) Subordinate and incidental to the principal use."  Section .177 permits agricultural and nonagricultural accessory uses.  Agricultural accessory uses include without

limitation the storage, distribution, and marketing of regional agricultural products, agriculturally related experiences, or the production, marketing, and distribution of value-added agricultural products. RCW 36.70A.177(3)(b)(i). Section .177 permits nonagricultural accessory uses if they are consistent with the size, scale, and intensity of the existing agricultural use of the property and the existing buildings on the site. RCW 36.70A.177(3)(b)(ii). Nonagricultural accessory uses, "including new buildings, parking, or supportive uses, shall not be located outside the general area already developed for buildings and residential uses and shall not otherwise convert more than one acre of agricultural land to nonagricultural uses." Id.

In King County v. Central Puget Sound Growth Management Hearings Board, 142 Wn.2d 543, 547, 14 P.3d 133 (2000) (hereafter Soccer Fields), the County and a local youth soccer association began acquiring land to develop into new athletic facilities. The effort targeted properties in the same Sammamish Valley area that is the focus of this case, which contained prime agricultural soil, and at the time the first property was acquired, the County's comprehensive plan discouraged active recreational uses within agricultural production districts (APDs). Id. The County amended its comprehensive plan and zoning code to allow active recreation in APDs. Id. at 548. Soccer Fields held that RCW 36.70A.020(8), .060(1), and .170 evidenced a legislative mandate for the conservation of agricultural land, and that section .177 must be interpreted in a manner consistent with that mandate. Id. at 562. The court concluded the GMA

did not allow the county to permit recreational facilities to supplant agricultural uses on designated lands with prime soils for agriculture.  Id.

1

The Board's finding that Ordinance 19030 authorizes uses in violation of section .177 is based on an erroneous reading of the Ordinance as allowing the repurposing of agricultural lands.  The Board stated that Ordinance 19030 is an attempt by the County to "permit previously unallowable uses within the [Sammamish Valley] APD," relying on decisions finding GMA violations where there were "no restrictions" on accessory uses in agricultural areas.  The Board never explains what uses it believed were allowable beforehand in the area zoned agricultural.  Ordinance 19030 replaced a previous use of "Winery/Brewery/Distillery," which was allowed in the agricultural zone but was "only allowed on sites where the primary use is . . . Growing and Harvesting Crops or . . . Raising Livestock and Small Animals."  This same limitation is retained for the new described uses WBD II and WBD III when established in the agricultural zone.  Compared to the superseded previous allowed use, the new WBD II and WBD III uses have amended provisions for lot size, floor area, structures, and on-site tasting, and new regulations governing parking, on-site production, location of nonagricultural facility uses, retail sales, and impervious surfaces.  Like the previous use category, a WBD II or WBD III use under Ordinance 19030 is permitted in the agricultural zone only on sites whose primary use is growing crops or raising livestock.  The new WBD II and WBD III uses must additionally comply

26

with Ordinance 19030's new requirements. Ordinance 19030 does not allow a previously unallowed use, but redefines a previously allowed use with new, more extensive requirements.

FoSV and Futurewise argued before the Board that Ordinance 19030 violated section .177 because its new regulations "do not require that WBDs be located in already developed portions" of agricultural parcels. Ordinance 19030 states that for WBD IIs and WBD IIIs in the agricultural zone, structures for nonagricultural facility uses "shall be located on portions of agricultural lands that are unsuitable for agricultural purposes," which the Ordinance describes as "areas within the already developed portion of such agricultural lands that are not available for direct agricultural production, or areas without prime agricultural soils." Focusing on the reference to areas "without prime agricultural soils," the Board saw a danger that suitable, but not prime, agricultural soils would be repurposed to accessory uses. This interpretation errs by overlooking the requirement that facilities be located only on land "unsuitable for agricultural purposes." In applying Ordinance 19030, the County must follow section .177, it may permit WBDs in agricultural lands only when the primary use on site is growing crops or raising livestock, and it may permit WBD facilities to be sited only on portions of agricultural lands unsuitable for agricultural purposes.

The Board further concluded that Ordinance 19030 was inconsistent with state law in requiring that "sixty percent" of the products processed at a WBD in the agricultural zone be grown "on-site." This was inconsistent, the Board stated,

No. 83905-5-I/28

with the requirement of the GMA that agricultural land must be "land primarily devoted" to commercial agricultural production under RCW 36.70A.030(3). The requirement that WBDs in the agricultural zone process products grown on site is a new requirement Ordinance 19030 imposes that did not exist before. Prior code for a winery, brewery, or distillery required only that 60 percent of the products processed be grown "in the Puget Sound counties." In allowing accessory WBD facilities only if the majority of the products processed are grown on site, Ordinance 19030 is more protective of agricultural production on site than previous code.

The Board raises the specter of the 60-percent-grown-on-site requirement being meant to create the appearance of promoting agriculture while in reality encouraging "banquet venues and distillery tasting rooms."[6] The Board described this provision of Ordinance 19030 as meaning that "consuming a hamburger at a fast-food tasting room is an agriculturally-related experience if some portion of the meat, lettuce, tomato or other ingredient are produced onsite." The Board described its task as determining "whether the WBDs allowed under Ordinance 19030 are legitimately accessory to fruit production, or whether fruit production merely justifies/is accessory to beverage-tasting and event venues." Futurewise makes a similar argument, based on Ordinance 19030's requiring only two stages of production to occur on site (another requirement new from prior code), meaning that three could occur offsite. We take these arguments as envisioning a nominal

---

[6] The Board's reference to "tasting rooms" in this context is somewhat misleading, because Ordinance 19030 does not allow what it refers to as "remote tasting rooms" except in Demonstration Project Overlay A.

28

No. 83905-5-I/29

*winery*, for instance, processing grapes grown on site into wine, whose main purpose is to serve as a *wine bar* providing tasting of other wines besides that produced on site.[7]

We do not agree that Ordinance 19030 disguises such intent. Before this scenario could occur, the County, applying Ordinance 19030, would need to conclude, consistent with section .177, the primary use on site is growing crops or raising livestock; winery facilities could be located only on portions of the lands unsuitable for agricultural uses; and enough of the site would need to be devoted to agricultural production so that 60 percent of the products processed came from the site. Other limitations would come into play as well, such as restrictions on the floor area devoted to on-site tasting or retail sales compared to production. Unlike the proposal in Soccer Fields, Ordinance 19030 when properly interpreted does

---

[7] For the first time in this court in a motion for reconsideration, FoSV and Futurewise argue that lines 510-12 of Ordinance 19030 eliminated what they call the " 'sales rule,' " and that appreciating the consequence of this is "essential for a fully informed analysis under SEPA and the GMA." This court generally does not consider arguments raised for the first time in a motion for reconsideration. Hous. Auth. v. Ne. Lake Wash. Sewer & Water Dist., 56 Wn. App. 589, 595 n.5, 784 P.2d 1284, 789 P.2d 103 (1990). We note, however, that FoSV and Futurewise focus on an alteration of preexisting code without recognition of its being replaced by new and different requirements. In the agricultural zone, former code allowed a use of "Liquor Stores," but only as accessory to the previous category of "SIC Industry No. 2081 Malt Beverages," and limited to sales of products "produced on site" and "incidental items" where the "majority" of sales was required to be from products "produced on site." Ordinance 19030 eliminates the allowance of "Liquor Stores" in agricultural zones. In agricultural zones, such use is superseded by the new WBD II and III uses, subject to the primary use requirement of growing crops or raising livestock, the 60-percent-grown-on-site requirement, retail sales limited to accessory use, and the other new restrictions set forth in the ordinance. While it is true there is not a majority sales requirement as there was before, that requirement is replaced by new and different requirements protective of agricultural lands consistent with section .177.

not repurpose agricultural lands into nonagricultural uses. The Board erred when it interpreted Ordinance 19030 otherwise.

2

The Board alludes to the prospect of events occurring in the agricultural zone and conflicting with agricultural uses. Ordinance 19030 creates new requirements and conditions for issuance of temporary use permits at the WBD facilities it allows. FoSV and Futurewise complain of several preexisting use patterns in the Sammamish Valley, such as activities exceeding building occupancy; involving "portable toilets"; exceeding the number of allowed parking spaces; using "temporary stages," "tents," or "canopies"; requiring "traffic control"; or extending "beyond allowable hours of operations." Ostensibly in response to these patterns, Ordinance 19030 newly requires a temporary use permit with certain exceptions. In the agricultural zone, the temporary use shall not exceed two events per month. During permit review, the County must "consider" building occupancy and parking limitations "in addition to all other relevant facts," and "shall condition the number of guests allowed for a temporary use based on those limitations." The County may not authorize more than 150 guests at a WBD II, or more than 250 guests at a WBD III. The Board found, without further analysis, "events of that size in agricultural areas without regulations ensuring adequate setbacks to prevent conflicts between agricultural activities and events" violates section .177's requirement that accessory uses do not interfere with agricultural use of neighboring properties.

No. 83905-5-I/31

The Board's focus on events appears to stem from its concern that Ordinance 19030 will promote the establishment of "banquet venues" in the agricultural zone. This interpretation neglects Ordinance 19030's requirement that sites in agricultural areas must be devoted to a primary use of growing crops or raising livestock. It also overlooks that temporary use permits are subject to the County's discretion to impose limitations to avoid the conflicts the Board fears. As discussed above, Ordinance 19030 alters the restrictions on temporary use permits in areas zoned rural area so that annual averages are applied, allowing events to be clustered in the summer months. But the same is not true in the agricultural zone in which events remain limited to two per month as they were under prior code. Finally, the Board's reference to the capacity limitations for events at WBDs ignores that these are caps newly imposed by Ordinance 19030 where none had existed before. Ordinance 19030 cannot be viewed as an expansion of the permissions allowed for events held in agricultural areas, and the Board erred in construing it to do so.

B

The Board and Futurewise maintain that Ordinance 19030 violates the GMA because it does not conform to the County's comprehensive plan. A land use decision need only generally conform to the comprehensive plan. Spokane County, 176 Wn. App. at 574-75; Woods v. Kittitas County, 162 Wn.2d 597, 613, 174 P.3d 25 (2007). We conclude that the Board's erroneous interpretation of Ordinance 19030 led to an erroneous conclusion that Ordinance 19030 failed to

31

"generally conform" to the comprehensive plan. The Board found that Ordinance 19030 was inconsistent with County Policy R-201. As emphasized by the Board, R-201 calls for development standards to "protect and enhance" "[t]he natural environment," "[c]ommunity small-town atmosphere, safety, and locally owned small businesses," and "[t]raditional rural land uses." The County's policy follows the GMA's requirement for the rural element of a comprehensive plan, which must "protect the rural character of the area." RCW 36.70A.070(5)(c). The Board concluded Ordinance 19030 thwarted these requirements based on its omitting adequate environmental review or sufficient development regulations to ensure "new allowable uses" are compatible with the "natural environment," "traditional rural land uses" of appropriate size and scale, and rural uses that "do not include primarily urban-serving facilities." The Board rejected the County's reliance on its "discretion to enhance the job base in rural areas and create opportunities for business development."

1

The Board asserted the County improperly ignored "the illegal nature" of existing uses "which could be addressed by code enforcement." The Board speculated that these uses, which the Board did not specifically identify, were "*apparently* not protected as prior non-confirming uses." (Emphasis added.)

As discussed above, the Board had no justifiable basis for concluding that any existing use was "illegal" or "could be addressed by code enforcement." As was true for agricultural lands, likewise for areas zoned rural area, prior code had

allowed a previous use of "Winery/Brewery/Distillery." Prior code stated tasting of products produced on site "may be provided in accordance with state law." Under Ordinance 19030, the accessory use is broadened to tasting and retail sales, but is subject to a new requirement that it "may occur only as accessory to the primary winery, brewery, distillery production use." The Board adopted an erroneous interpretation of Ordinance 19030 when concluding it led to "new allowable uses," and improperly speculated when it assumed that Ordinance 19030 legalized previously illegal uses. When properly interpreted as imposing new regulations over what had been allowed under the previous "Winery/Brewery/Distillery" use, Ordinance 19030 does not fail to "generally conform" to R-201.

2

FoSV argues that Ordinance 19030's new provision for "[t]asting and retail sales" at WBD facilities creates a hidden expansion of retail sales, because, according to FoSV, "state law" permits a winery to sell wine "of its own production" at an off-site "additional location." RCW 66.24.170(3). FoSV theorizes that the new language would allow a WBD functioning merely as a "retail" "storefront" for an Eastern Washington winery. FoSV does not establish (and we do not decide) that state law would operate in this manner. In any event, Ordinance 19030 creates a new requirement that a WBD facility may occur "only" as "accessory" to a "primary" winery, brewery, or distillery "production" use. When read in the context of this new requirement, Ordinance 19030 does not create a hidden expansion of "retail" "storefront" operations without a primary production use on site.

FoSV also disputes the import of the new requirement that two stages of production occur on site, describing this as an "[i]llusory" production requirement. FoSV argues that Ordinance 19030 addresses production in a manner amounting to a "loophole," by allegedly allowing WBDs "with no <u>realistic</u> production capabilities" if there is "a single barrel out back labelled 'fermenting', 'aging', or 'finishing,' but only constituting a negligible fraction" of sales. FoSV points out that prior code required that in the rural area 60 percent of the materials processed be grown in Puget Sound counties. As noted above, Ordinance 19030 changes this to a 60-percent-grown-on-site requirement, but it also limits that requirement to agricultural areas. As a result, FoSV argues, in the rural area, Ordinance 19030 replaces the former requirement of 60 percent grown in Puget Sound counties with a new definition of production requiring only that two stages of production occur on site, a requirement FoSV argues can be exploited by a site primarily importing wine from Eastern Washington having a "single barrel out back."

These arguments also overlook that Ordinance 19030 imposes a new requirement in the rural area that the "primary" use at a WBD be winery, brewery, or distillery "production use." By requiring a primary production use in the rural area, Ordinance 19030 does not authorize a WBD lacking realistic production capabilities and attempting to justify a primary *retail* use through two stages of production of a negligible or sample production quantity. When properly

34

No. 83905-5-I/35

interpreted, Ordinance 19030 does not authorize uses inconsistent with traditional rural land uses under R-201.[8]

3

FoSV contends that Ordinance 19030 does not generally conform to the County's Policy SO-120. This policy explains that "[t]he purpose of the agricultural production buffer special district overlay" is to provide a buffer between agricultural land "and upslope residential land uses." KING COUNTY CODE 21A.38.130(A). To implement this policy, the code applies to "residential subdivisions locating in an agricultural production buffer special district overlay," and requires that "[l]ots shall be clustered . . . and at least seventy-five percent of a site shall remain as open space." KING COUNTY CODE 21A.38.130(B). FoSV does not demonstrate that Ordinance 19030's amendments to the uses allowed in the rural area zone implicate this policy applicable to "residential subdivisions." Ordinance 19030 does not authorize any "residential subdivisions" and does not authorize any use that would not still be subject to SO-120.

While this code provision governs residential subdivisions, Futurewise and FoSV nevertheless argue that the purpose of the code is to limit surface development to prevent damaging runoff flowing from upslope lands into the agricultural lands and the river. Ordinance 19030 imposes a protection against

---

[8] FoSV and Futurewise's new argument in seeking reconsideration that the elimination of the "sales rule" violates the GMA makes the same error in regard to the rural area as noted above in regard to the agricultural zone. In superseding the former use of "Liquor Stores," Ordinance 19030 makes WBD uses in the rural area subject to new and different requirements, including a primary production use and limiting retail sales to a use accessory to the primary production use.

No. 83905-5-I/36

surface development for WBD facilities in requiring that "[t]he impervious surface associated with the winery, brewery, distillery facility use shall not exceed twenty-five percent of the site, or the maximum impervious surface for the zone in the according with [King County Code] 21A.12.030[(A)] or 21A.12.040[(A)], whichever is less." This is both a new requirement for WBD facilities and one that generally conforms to SO-120's requirement that 75 percent of a residential subdivision in an agricultural buffer overlay remain as open space. This requirement is not imposed on a "remote tasting room" established within the 13 parcels within Demonstration Project Overlay A, which lie within the agricultural buffer overlay. But FoSV and Futurewise point to no evidence that Demonstration Project Overlay A will likely increase impervious surface on or runoff from these 13 parcels. Ordinance 19030 does not exempt these parcels from existing law imposing impervious surface regulations and surface water management regulations. There is no basis for concluding that there will be increased runoff from these parcels in a manner that does not generally conform to SO-120.

4

The Board found that Ordinance 19030 failed to "generally conform" to the County's general code provisions for the vesting of prior nonconforming uses under King County Code 21A.32.040. But this conclusion was based on the Board's assumption that Ordinance 19030's Demonstration Project Overlay A coincides with "sites on which illegal operations are currently known to be in existence." This assumption was unjustified, because nothing supported the

No. 83905-5-I/37

Board in concluding any individual use was "illegal," nor does Ordinance 19030 legalize any preexisting "illegal" use. When properly interpreted, Ordinance 19030 does not fail to "generally conform" to the County's existing vesting rules.

IV

In addition to reviewing GMA compliance, "hearings boards may review petitions alleging a county did not comply with SEPA in adopting or amending its comprehensive plan or development regulations." Spokane County, 176 Wn. App. at 569-70. The legislature enacted SEPA in 1971, expressing the aim of injecting environmental awareness into governmental decision-making. Wild Fish Conservancy v. Dep't of Fish & Wildlife, 198 Wn.2d 846, 855, 502 P.3d 359 (2022). SEPA is a procedural statute to ensure that environmental impacts and alternatives are properly considered. Save Our Rural Env't v. Snohomish County, 99 Wn.2d 363, 371, 662 P.2d 816 (1983).

SEPA and its implementing regulations require that the government conduct environmental review, through at least a threshold determination, for any proposal that meets the definition of an action. Int'l Longshore & Warehouse Union, Loc. 19 v. City of Seattle, 176 Wn. App. 512, 519, 309 P.3d 654 (2013). A project action involves "a decision on a specific project, such as a construction or management activity located in a defined geographic area." WAC 197-11-704(2)(a). "Nonproject" actions are "actions which are different or broader than a single site specific project, such as plans, policies, and programs." WAC 197-11-774. The purpose of SEPA rules is to ensure an agency fully discloses and

No. 83905-5-I/38

carefully considers a proposal's environmental impacts before adopting it and at the earliest possible stage. Spokane County, 176 Wn. App. at 579. An agency may not postpone environmental analysis to a later implementation stage if the proposal would affect the environment without subsequent implementing action. Id.

The agency must use an environmental checklist to assist its analysis and must document its conclusion in a threshold determination of significance, a determination of mitigated nonsignificance, or a DNS. Id. at 578-79; WAC 197-11-350. A determination of significance requires the preparation of an EIS. RCW 43.21C.030(2)(c); WAC 197-11-400(2). The agency must base its threshold determination on "information reasonably sufficient to evaluate the environmental impact of a proposal." WAC 197-11-335. A threshold determination must not balance whether the beneficial aspects of a proposal outweigh its adverse impacts but, rather, must consider whether a proposal has any probable significant adverse environmental impacts. WAC 197-11-330(5). If the responsible official determines there will be no probable significant adverse environmental impacts from a proposal, the agency must issue a DNS.[9] WAC 197-11-340.

_____

[9] There is no dispute the responsible official was charged with determining whether Ordinance 19030 would have probable significant environmental impacts when making the threshold determination. Futurewise takes out of context a statement from Heritage Baptist when it further argues that the responsible official could not consider other code requirements that would necessarily bear on any future projects in evaluating the likelihood that Ordinance 19030 would have probable significant environmental impacts. In Heritage Baptist, we stated, "[A] county, city, or town may not rely on its existing plans, laws, and regulations when evaluating the adverse environmental impacts of a nonproject action." 2 Wn. App. 2d at 752. This referred to the requirements for a supplemental EIS examining a

No. 83905-5-I/39

The agency has the burden of showing prima facie compliance with the procedural requirements of SEPA. Juanita Bay Valley Cmty. Ass'n v. City of Kirkland, 9 Wn. App. 59, 73, 510 P.2d 1140 (1973). A threshold determination that an EIS is not required is reviewed under the "clearly erroneous" standard. Chuckanut Conservancy v. Dep't of Nat. Res., 156 Wn. App. 274, 286, 232 P.3d 1154 (2010). The scope of review is broad, and the search for significant environmental impacts must be considered in light of the public policy of SEPA. Id. The public policy of SEPA is consideration of environmental values. Nor. Hill Pres. & Prot. Ass'n v. King County Council, 87 Wn.2d 267, 275, 552 P.2d 674 (1976). In any action involving an attack on a determination by a governmental agency relative to the requirement or the absence of the requirement, or the adequacy of a "detailed statement," the decision of the governmental agency must be accorded substantial weight. RCW 43.21C.090.

---

rezone, in which it is settled " 'the environmental consequences are discussed in terms of the maximum potential development of the property.' " Id. (quoting Ullock v. City of Bremerton, 17 Wn. App. 573, 581, 565 P.2d 1179 (1977)). Moreover, Heritage Baptist relied on a statement in a footnote in Spokane County noting that a statute directed issuance of a DNS in certain situations in which existing development regulations " 'provide adequate analysis of and mitigation for the specific adverse environmental impacts of the project action,' " but this "exception" does not apply to a nonproject action. 176 Wn. App. at 578 n.4 (quoting RCW 43.21C.240(1)). The responsible official in this case did not attempt, as the agency had in Heritage Baptist, to undertake an EIS let alone assume something less than maximum potential development following the rezone in doing so or, as the court alluded to in Spokane County, to rely on a statutory provision directing the outcome of the threshold determination.

No. 83905-5-I/40

A

The County challenges the Board's finding that the responsible official included "illegal uses" as a baseline condition for the SEPA threshold determination, because it was not supported by evidence in the record. Futurewise argues that the Board correctly concluded that Demonstration Project Overlay A legalized uses that are not currently allowable and that the impacts of legalizing these uses were never considered by Peterson or in the Checklist.

In Chuckanut Conservancy, the court addressed the "baseline" against which to evaluate the environmental impacts. 156 Wn. App. at 283. The term "baseline" is a term borrowed from National Environmental Policy Act of 1969, 42 U.S.C. § 4321, jurisprudence, and is a practical tool often employed to identify the environmental consequences of a proposed agency action. Chuckanut Conservancy, 156 Wn. App. at 284 n.8. In Chuckanut Conservancy, Blanchard Forest was proposed to be divided into four management zones: for conservation and recreation, for habitat conservation, for logging, and for revenue production. Id. at 281. It was undisputed the forest had been logged before the new management plan and would continue to be under the new plan. Id. at 280-82. Those challenging the management plan argued that the "decision to protect the core zone from logging demonstrates that all of the Blanchard Forest need not be logged" and that the environmental impacts "must be evaluated against a 'no logging' use." Id. at 289. We rejected this argument, holding the agency's task is

40

No. 83905-5-I/41

to "analyze the proposal's impacts against existing uses, not theoretical ones." Id. at 290.

In Quadrant Corp., the court held that agencies planning under the GMA should consider vested development rights when determining whether an area "already is characterized by urban growth" according to RCW 36.70A.110(1). 154 Wn.2d at 228. The vested rights doctrine establishes that land use applications vest on the date of submission and entitle the developer to divide and develop the land in accordance with the statutes and ordinances in effect on that date. Id. at 240. The Growth Management Hearing Board had determined that counties could consider only the "built environment." Id. The court found this unreasonably precluded local jurisdictions from considering vested rights to divide and develop land and erroneously forced counties to ignore the likelihood of future development. Id. at 241.

Under both Chuckanut Conservancy and Quadrant Corp., the appropriate baseline from which to gauge Ordinance 19030's impact was the existing uses ongoing in the Sammamish Valley at the time Ordinance 19030 was enacted. It would be speculative to attempt to evaluate the impact of Ordinance 19030 based on the possibility—which was never established—that the County could have forced the cessation of one or more businesses had Ordinance 19030 never been enacted. Those challenging Ordinance 19030 point to Matthews's case as one demonstrating the environmental threat to the Sammamish Valley from the prospect of new development. The County points to it as demonstrating the

41

No. 83905-5-I/42

challenge of enforcement against such establishments under preexisting code. Ordinance 19030 does not legalize any previously terminable uses but explicitly requires that uses comply with former code or its new requirements. To the extent code violations are documented, they establish that some businesses in the Sammamish Valley were required to address code violations over a period ranging at least from 2006 to 2017, but they do not establish that any of the businesses could not exist in their current form either because they could be abated under code or because they could not continue as nonconforming uses.[10]

B

The County challenges the Board's finding that the DNS impermissibly used potential benefits of Ordinance 19030 to balance the potential negative impacts of the proposal, in violation of WAC 197-11-330(5). FoSV responds by stating that the SEPA checklist is neither a bibliography nor a balancing act, but is a full disclosure document that must provide enough information to adequately inform the County Council as to the likely significant environmental impacts of their action. Relying on WAC 197-11-330(5), Futurewise argues that the Board was correct to

---

[10] Another new argument in FoSV and Futurewise's motion for reconsideration is their contention that five businesses were illegal before Ordinance 19030 because they had insufficient lot size. They cite a spreadsheet they say was prepared by the County showing winery establishments in the county and listing lot sizes, which FoSV and Futurewise compare to former code. The spreadsheet does not identify the businesses as illegal or subject to abatement, the Board did not find existing uses were illegal on this basis, and FoSV and Futurewise did not make this argument in their briefs. We decline to consider this new argument. Hous. Auth., 56 Wn. App. at 595 n.5.

42

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

conclude that the responsible official engaged in illegal balancing of positive and negative impacts of Ordinance 19030.

Under WAC 197-11-330(5), Peterson was not permitted to balance any beneficial aspects of Ordinance 19030 with its adverse impacts but rather had to consider whether the proposal had any probable significant adverse environmental impacts. The Board first seemed to believe that the County was engaged in improper balancing by touting the benefits of, as the Board put it, "[b]uilding out the rural area of the Sammamish Valley into a string of upscale spirit tasting and wedding venues." Nothing in the DNS suggests this was a motivation in evaluating the probable impacts of Ordinance 19030, or a likely effect of the Ordinance. By imposing requirements of primary agricultural and production uses across the areas in question, the Ordinance does not allow primary spirit tasting and event venue businesses.

The Board also implies that Peterson engaged in impermissible balancing when he stated that the vast majority of Ordinance 19030's amendments result in new limitations on WBD uses, as opposed to expanding or introducing new uses previously unpermitted. For instance, the Board stated that Ordinance 19030 eliminated the "on-site production requirement" of the former code and reduced the minimum lot size for some WBD uses in the rural area from 4.5 acres to 2.5 acres, which, the Board asserted, "Common sense dictates" will increase "the number of parcels eligible" for siting WBD uses. These statements take the provisions of Ordinance 19030 out of context. Simultaneously the Ordinance

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

newly limits WBD uses in the agricultural and rural area zones to sites whose primary use is growing crops, raising livestock, or winery, brewery, or distillery production, and requires at least two stages of production to occur on site. "Common sense" might dictate that removing an on-site production requirement or reducing the minimum lot size *alone* would logically open up more parcels to more allowed uses, but the same does not hold for an overlay of extensive new regulation with new and different terms.

Futurewise argues an analysis of rural area parcels FoSV presented to the County should have been considered in the Checklist and DNS. The analysis lists 43 rural area parcels greater than 2.5 acres and the theoretical permissible amount of commercial space for WBD II or III uses Ordinance 19030 would allow. However, 29 of these parcels are equal to or greater than 4.5 acres and already qualified for WBD uses under preexisting code without any of the new restrictions Ordinance 19030 imposes. It remains speculative that any parcels, including these 43, would be the site of new development, and no representation is offered that they lie in the Sammamish Valley or that their development would have any of the environmental consequences FoSV and Futurewise attributed to the Ordinance.

FoSV and Futurewise rely on evidence that existing uses for events and tasting rooms dependent on wine produced in Eastern Washington has in the past created traffic, commercialization, and encroachment concerns. Under Ordinance 19030, new WBD I, II, and III uses must, in the agricultural zone, be based on 60 percent of their product being grown on site, and in the rural area zone, be based

No. 83905-5-I/45

on a primary production use. FoSV and Futurewise identify no substantial evidence in the administrative record, and we have found none, that, on a nonspeculative basis, new WBDs are likely to occur in any numbers or cause any new or increased traffic, commercialization, or encroachment concerns. FoSV and Futurewise identify no substantial evidence that new remote tasting room uses are likely, considering that they can exist only on 13 parcels in Demonstration Project Overlay A, several of which are already occupied. In concluding that Ordinance 19030 does not exhibit a likelihood of generating new, nonspeculative adverse impacts, Peterson did not engage in improper balancing.

C

The County challenges the Board's finding that the Checklist, as supplemented by the 2020 Checklist, failed to evaluate all reasonably foreseeable impacts of the proposal by impermissibly delaying environmental review to the project phase, in violation of WAC 197-11-060. Futurewise contends that the Checklist's repetitive variation on the phrase "not applicable for this nonproject action" as a response to most of the Checklist's questions violates SEPA. The Study of wineries in the Sammamish Valley and the Action Report are referenced in the Checklist. The Study and Action Report are high-level documents, and neither contains detailed discussion of any environmental concerns for the Sammamish Valley or any potential impacts of potential legislation. We agree with FoSV and Futurewise that the Study and Action Report by themselves cannot satisfy the requirement of SEPA that the Checklist "provide information reasonably

45

No. 83905-5-I/46

sufficient to evaluate the environmental impact of the proposal." Anderson v. Pierce County, 86 Wn. App. 290, 301, 936 P.2d 432 (1997) (citing WAC 197-11-315 to -335).

However, the County prepared an amended checklist on remand from the Board's first order pursuant to RCW 36.70A.300. The 2020 Checklist discusses the likelihood that Ordinance 19030 will lead to the development identified as posing a risk to the Sammamish Valley and is supplemented by an analysis of the code changes Ordinance 19030 makes as compared to prior code. If the checklist does not contain sufficient information to make a threshold determination, the applicant may be required to submit additional information. Moss v. City of Bellingham, 109 Wn. App. 6, 14, 31 P.3d 703 (2001) (citing WAC 197-11-335(1)). We agree with the County that when the appropriate baseline is used and the restrictive provisions of the Ordinance are taken into account, the 2020 Checklist is adequate to support the DNS.

In Spokane County, the court held the hearings board did not err in finding SEPA noncompliance because the record showed that the county failed to fully disclose or carefully consider specific, probable environmental impacts before the amendment was adopted and at the earliest possible stage. 176 Wn. App. at 581. The county characterized the proposals as nonproject actions, leaving much of the required environmental analysis to be determined if site specific developments are proposed. Id. at 563. The checklist did not tailor its scope or level of detail to address the probable impact resulting from the amendment. Id. at 580. The

46

checklist repeated formulaic language postponing environmental analysis to the project review stage and assuming compliance with applicable standards. Id. at 580-81. The court found the checklist lacked information reasonably sufficient to evaluate the proposal's environmental impacts. Id. at 581.

In Chuckanut Conservancy, the court held the DNS did not clearly err in determining that a forest management plan did not require an EIS. 156 Wn. App. at 293. The management plan called for a recreational overlay applicable to all management zones in the forest and changed no existing regulations, policies, or plans; new projects would be subject to environmental review. Id. at 282-83. The DNS reasoned that the management plan was a nonproject action outlining management objectives to be implemented under existing rules and policies and therefore generated no environmental impacts by themselves. Id. at 283. The DNS considered the entire regulatory and policy system governing forestry on state lands. Id. at 290. The management plan had no bearing on the selection of future forest practices. Id. at 292. The challenger did not clarify what adverse impacts may result from the management plan, and its true argument was that the management plan did not eliminate all environmentally adverse impacts on the forest. Id. The agency did not improperly rely on the existing regulatory and policy framework in its threshold review, since the management plan made no changes to existing uses except to preserve some tracts from harvest. Id.

The Board's decision, Futurewise, and FoSV do not point to substantial evidence that Ordinance 19030's provisions will likely have a nonspeculative

adverse impact that the County failed to consider. Their concerns for the legalization of existing uses are almost entirely confined to 13 parcels where, much as the challengers alleged in Chuckanut Conservancy, they allege long-standing existing uses will not be curtailed by the new Ordinance. The County did not postpone environmental analysis of the potential impacts of Ordinance 19030 to the extent they are probable and not speculative. The comparative analysis of code changes between Ordinance 19030 and prior code added to the 2020 Checklist bears out this conclusion. This both relied on the appropriate baseline of the ongoing use patterns and appropriately incorporated Ordinance 19030's restrictive elements. This analysis considered, among other things, impacts to water use within the Woodinville water district, impacts of event and WBD II and III locations including traffic congestion and noise, impacts of decreasing on-site parking requirements for WBDs including a potential reduction in visitors, and impacts of reductions to impervious surface requirements. Analogously to Chuckanut Conservancy, Ordinance 19030 creates new and different requirements alongside an existing array of environmental and other development regulations. We agree with the County that it is speculative to say that the Ordinance is likely to result in the proliferation of WBD uses to a degree different than was already allowed under the former code.

When Ordinance 19030 is considered as a whole, in agricultural areas it restricts WBD uses to those that are accessory within the meaning of King County Code and section .177 to primary uses of growing crops or raising livestock, and

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

in rural areas it restricts them to uses accessory to primary production uses. These overarching restrictions, like many others appearing in the ordinance, are never mentioned in the Board's 55-page order. Because, correctly interpreted, Ordinance 19030 is more restrictive than the Board interpreted it to be, Peterson was correct to conclude that it would be speculative to forecast that it will result in redevelopment of the Sammamish Valley to any identifiable degree. The County was entitled for this nonproject action to rely on project-level requirements that individual developments comply with SEPA, existing legal requirements, and Ordinance 19030's requirements as described in this opinion.

V

A correct interpretation of Ordinance 19030 demonstrates that it does not violate section .177 and generally conforms to the County's comprehensive plan, Ordinance 19030 does not violate the GMA, the Board erroneously interpreted or applied the law in violation of RCW 34.05.570(3)(d), and the DNS supporting Ordinance 19030 did not violate SEPA. We reverse the Board's order of invalidity and remand to the Board with instructions to reinstate the DNS and enter a finding of GMA and SEPA compliance.

_____
Birk, J.

WE CONCUR:

_____          _____
Mann, J.                          Dwyer, J.

49